[Crim. No. 10129.   In Bank.   Feb. 8, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD
LOUIS ARGUELLO, Defendant and Appellant.

770

Thomas Whelan, under apointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—Defendant was found guilty by a jury of first degree murder, and the penalty was fixed at death. On appeal, the judgment was reversed insofar as it related to penalty but affirmed in all other respects. (*People* v. *Arguello,* 61 Cal.2d 210 [37 Cal.Rptr. 601, 390 P.2d 377].) At the second penalty trial the death sentence was again imposed. On appeal we recalled the remittitur in *People* v. *Arguello, supra,* 61 Cal.2d 210, vacated our judgment, and reversed the judgment appealed from in its entirety. (*People* v. *Arguello,* 63 Cal.2d 566 [47 Cal.Rptr. 485, 407 P.2d 661].) A jury again found defendant guilty of first degree murder and fixed the penalty at death. Motions for a new trial and for reduction of sentence were denied, and defendant's third automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends that the evidence is insufficient to support the verdict, that evidence was erroneously admitted, that the prosecutor was guilty of misconduct, and that the court erred in its instructions to the jury. We have concluded that none of these contentions can be upheld and that the judgment should be affirmed.

Much of the evidence at the prior trials was introduced at the present trial and may be summarized in a similar manner to that employed on defendant's prior automatic appeals.

The body of Marie Chapman, an 82-year-old widow, was found by a neighbor in the bathroom of her home in San Diego about 5 o'clock in the afternoon on November 9, 1961. According to the autopsy surgeon, death resulted from multiple skull fractures and lacerations of the brain and throat. Mrs. Chapman ordinarily kept the doors to her house locked and was cautious in admitting persons into her home. A police inspection of the house revealed nothing to indicate a forced entry. About 9 a.m. on the day Mrs. Chapman was killed a neighbor heard her talking to someone in a raised voice. Mrs.

Chapman's sister-in-law telephoned her at 11 a.m. and got no answer.

Defendant had worked for Mrs. Chapman periodically for several years as a handyman. About 11:30 a.m. on the day Mrs. Chapman was killed he arrived at the home of his friend, Mrs. Josephine Mendoza, who lived in the same neighborhood as Mrs. Chapman. He changed his clothes at Mrs. Mendoza's home and gave his trousers to her daughter to wash. The police found blood on the trousers, and there was evidence that defendant cut his finger while wearing the same kind of trousers a few days before. However, it was determined that the blood was not defendant's type and that it was the same type as decedent's. Soon after arriving at Mrs. Mendoza's home on November 9 defendant wiped his hands on a towel that may have been used by others and tests revealed a substance on the towel that "very probably was blood."

A chemical analysis of a brick found in Mrs. Chapman's closet revealed "the probable presence of blood," and the autopsy surgeon testified that a brick could have caused one of her skull fractures. There was soil on the brick and on Mrs. Chapman's body, which tests disclosed was the same as that found in the yard behind the house of defendant's uncle, and the soils all contained distinctive characteristics not commonly found in soil. The police while searching the yard, discovered what appeared to be an impression made by the narrow side of the brick, and the brick found in Mrs. Chapman's closet had soil on its narrow side. Defendant's uncle testified that defendant did not sleep at his house on the night of November 8, 1961, but according to Mrs. Mendoza, who testified through an interpreter, when defendant left her house on the night of November 8 he stated that he was going "with his uncle."

A knife discovered in a kitchen drawer was bloodstained, but tests were inconclusive as to whether the blood was of human origin. A hammer was found attached to Mrs. Chapman's neck by a cord, and the autopsy surgeon testified that one of the injuries to her skull could have been inflicted with the hammer. The cord was tied to the hammer by a type of knot not commonly used, although it would be familiar to some members of certain groups such as sailors. On one occasion following his arrest defendant was asked to tie a piece of cord, and the knot he made was dissimilar to that used in fastening the cord to the hammer. Subsequently, while awaiting trial defendant tied a bundle of clothing with string, and

the knot he made this time was the same type as the one used to tie the cord to the hammer.

Mrs. Chapman had at least $58.60 in her purse six days before she was killed, but a search of her home after her death disclosed only two silver dollars in a trunk and less than 50 cents in her purse. Defendant tried unsuccessfully to borrow $5 from Mrs. Chapman's sister-in-law on November 7, 1961, and he told Mrs. Mendoza the next day that he had $2. He had about $35 when he arrived at Mrs. Mendoza's home on November 9, the day Mrs. Chapman was killed.

Defendant did not take the stand at the instant trial, and no witnesses were called to testify in his behalf.

At the penalty trial the parties stipulated that the evidence at the guilt trial might be considered by the jury in determining the penalty. In addition the prosecution introduced evidence that defendant was convicted of forgery in 1930 and served a term at San Quentin and that in 1956 he was again convicted of forgery. It was stipulated that the latter offense was a misdemeanor.

The evidence is clearly sufficient to support the verdict.

■ Over objection, the prosecution introduced testimony by Mrs. Patricia Baugh, a next-door neighbor of Mrs. Chapman, that during visits she had with Mrs. Chapman from 1959 to 1961 Mrs. Chapman stated (1) that for her own protection she did not allow strangers into the house, (2) that she had a cane ''as a means of defense,'' and (3) that should she be in trouble she would scream from her bedroom windows and Mrs. Baugh would hear her. Immediately after the evidence was received the court instructed the jury that it was admitted to show the state of mind of Mrs. Chapman and for that purpose only. Defendant now urges that the evidence was inadmissible hearsay. The evidence, however, was not objectionable as hearsay since it was admitted solely as evidence of the deceased's state of mind. (*People* v. *Brust,* 47 Cal.2d 776, 784-785 [306 P.2d 480]; see also *People* v. *Atchley,* 53 Cal.2d 160, 171-172 [346 P.2d 764]; see Witkin, Cal. Evidence (2d ed. 1966) p. 429; McCormick on Evidence, pp. 465-466, 567; 6 Wigmore, Evidence, § 1790.) The statements tended to show that the deceased was fearful especially of strangers, a matter relevant to the prosecution's theory that the murderer was not a stranger to her.

The present case is unlike *People* v. *Hamilton,* 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473], relied upon by defendant. There declarations by the decedent referring to past

conduct of the defendant that caused her to fear him were admitted solely to show her state of mind, and it was held that their admission constituted prejudicial error. The opinion pointed out (at p. 895) that in such a case "the authorities are agreed that it is impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations."

Mrs. Marie Krusinsky testified that on November 8, 1961, she heard a male and a female voice coming from Mrs. Chapman's home. She was then permitted to testify, over objection, that she heard the female voice say "No. I'm not going to give you any more. You got all you are going to get from me. I am not giving you any more money. . . . Get away from me. . . ." Defendant argues in effect that the evidence is irrelevant because Mrs. Krusinsky did not identify the voices she heard as those of Mrs. Chapman and defendant. However, since Mrs. Krusinsky heard the voices coming from Mrs. Chapman's house and there is no evidence that any other woman lived in the house, it could be inferred that the female voice was hers. Evidence that defendant was a male Mrs. Chapman would allow inside her house, that he borrowed money from her less than three weeks before the conversation, and that he tried to borrow money from her sister-in-law the day before the conversation tends to show that the male voice was his.

Defendant further argues that the statement Mrs. Krusinsky testified she overheard constituted inadmissible hearsay. However, it was not hearsay insofar as it was offered to prove that the man to whom Mrs. Chapman spoke believed she would not voluntarily give him any more money (*People* v. *Marsh,* 58 Cal.2d 732, 737 et seq. [26 Cal.Rptr. 300, 376 P.2d 300] ; see Witkin, Cal. Evidence (2d ed. 1966) pp. 429-432), a matter bearing on the question of motive. Insofar as it was offered to prove Mrs. Chapman's state of mind or intent not to loan any more money to the person to whom she spoke, a matter similarly bearing on the question of motive, it was hearsay but admissible under the exception to the hearsay rule pertaining to the mental state of the declarant. (*People* v. *Brust, supra,* 47 Cal.2d 776, 784-785 ; *People* v. *Weatherford,* 27 Cal.2d 401, 421, 423 [164 P.2d 753].)

The evidence that defendant tied a bundle of clothing with string using a knot of the same type as the one used to tie the cord to the hammer was admitted over an objection on the grounds that the evidence was obtained by means of a subter-

fuge and in violation of his right to counsel. It appears that the district attorney asked one of his investigators to go to the jail where defendant was incarcerated to "see about having him tie a package." The investigator talked with an officer at the jail, and the officer subsequently gave defendant a bundle of clothing and string, asked him to tie up the clothing, and did not inform him that he had a right to an attorney and to remain silent or that the officer was acting at the request of the district attorney's investigator.

Deception alone does not render incriminating statements inadmissible if it was not of a type reasonably likely to procure an untrue statement. (*People* v. *Atchley, supra,* 53 Cal.2d 160, 171; *People* v. *Ross,* 236 Cal.App.2d 364, 377 [46 Cal.Rptr. 41]; Witkin, Cal. Evidence (2d ed. 1966) pp. 446-448.) ■ Similarly the deception employed in getting defendant to tie the knot did not render the evidence inadmissible.

■ Nor was the evidence inadmissible under the rule in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]. "The right to counsel during police interrogation established in *Escobedo* v. *Illinois, supra,* is designed to prevent the use of coercive practices to extort confessions or other incriminating statements. [Citation.] It does not protect a defendant from revealing evidence against himself in other ways. It applies only when 'the police carry out a process of interrogations that lends itself to eliciting incriminating statements, . . .'" (*People* v. *Graves,* 64 Cal.2d 208, 210-211 [49 Cal.Rptr. 386, 411 P.2d 114] [cert. denied] 285 U.S. 883 [17 L.Ed.2d 111, 87 S.Ct. 285]; see also *Schmerber* v. *California,* 384 U.S. 757 [16 L.Ed.2d 908, 917, 86 S.Ct. 1826].)

Seven photographs of Mrs. Chapman taken at the morgue were admitted over an objection by defendant on the ground that they were gruesome. ■ When allegedly gruesome photographs are presented, the trial court in the exercise of its discretion must decide whether their probative value outweighs their possible prejudicial effect. (*People* v. *Arguello, supra,* 61 Cal.2d 210, 213; *People* v. *Harrison,* 59 Cal.2d 622, 627-628 [30 Cal.Rptr. 841, 381 P.2d 665]; *People* v. *Brommel,* 56 Cal.2d 629, 635-636 [15 Cal.Rptr. 909, 364 P.2d 845].) ■ The photographs show the wounds Mrs. Chapman received and tended to assist the jury in understanding the testimony of the autopsy surgeon regarding her injuries. In a number of instances the autopsy surgeon described a wound and pointed it out to the jury on one of the pictures. In

addition to illustrating and clarifying the surgeon's testimony the pictures constitute circumstantial evidence of defendant's malice. Although they are unpleasant to view, it cannot be said that the trial court abused its discretion in overruling defendant's objection.

Defendant next argues that an insufficient foundation was laid for the admission of those photographs. A criminalist called by the prosecution testified that the photographs were taken by him and that they are true and accurate representations of what they show. ■ Testimony of a person present at the time a picture was taken that it accurately depicts what it purports to show is a legally sufficient foundation for its admission into evidence. (*People* v. *Bowley,* 59 Cal.2d 855, 859 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178] ; *Berkovitz* v. *American River Gravel Co.,* 191 Cal. 195, 201-202 [215 P. 675].) ■ Moreover, at the trial defendant made no objection to the pictures on the ground that a sufficient foundation had not been laid, and he may not raise the matter for the first time on appeal. (*People* v. *Spencer,* 60 Cal.2d 64, 77-78 [31 Cal.Rptr. 782, 383 P.2d 134] ; see *People* v. *Wright,* 26 Cal.App.2d 197, 207 [79 P.2d 102].)

■ In his closing argument the prosecutor stated that "The brick and other implements of the crime came from a shed in the back of [the] house [of defendant's uncle]," and the prosecutor subsequently made comments indicating that the knife and hammer came from Mrs. Chapman's house and stated that "somebody would have to know where [they were]." Defendant did not object at the trial to the foregoing comments but now urges that they were not based upon any evidence. The prosecutor "has a wide range in which to state his views as to what the evidence shows and as to conclusions to be drawn therefrom" (*People* v. *Lopez,* 60 Cal.2d 223, 252 [32 Cal.Rptr. 424, 384 P.2d 16] ; *People* v. *Burwell,* 44 Cal.2d 16, 39-40 [279 P.2d 744]), and the complained of comments did not exceed the permissible bounds. As we have seen, there was evidence from which it could be inferred that the brick came from the yard of defendant's uncle. Cord of the same type as that fastened to the hammer was discovered in a shed behind the uncle's house. The knife was discovered in a kitchen drawer at decedent's house, and the hammer was found by her body.

There is no merit to defendant's argument that the court gave an instruction concerning parole that was improper under *People* v. *Morse,* 60 Cal.2d 631 [36 Cal.Rptr. 201, 388

P.2d 33]. The instruction given by the court was substantially identical to the one approved in *Morse* (60 Cal.2d 631, 647-648).

Other contentions are without merit and need not be discussed.

The judgment is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Sullivan J., and Roth, J. pro tem.,* concurred.

Appellant's petition for a rehearing was denied March 29, 1967. Roth, J. pro tem.,* sat in place of Mosk, J., who deemed himself disqualified.