[Crim. No. 2867.    Fourth Dist., Div. One.    May 22, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK J. RAGEN, Defendant and Appellant.

Harelson, Enright, Levitt & Knutson, William B. Enright, Kaplan, Livingston, Goodwin, Berkowitz & Selvin and Herman F. Selvin for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

BROWN (Gerald), P. J.—Frank J. Ragen appeals from a judgment of conviction entered after a jury found him guilty of raping a female under the age of 18 years (Pen. Code, § 261, subd. 1), raping a female prevented from resisting by his having administered an intoxicating narcotic or anesthetic substance (Pen. Code, § 261, subd. 4), and two counts of sex perversion (Pen. Code, § 288a).

As of May 26, 1966, Ragen, a general medical practitioner, was treating 16-year-old tonsillitis patient Diane. On that date, Diane appeared at Ragen's office at 5:40 p.m., as he had instructed her. No receptionist was there. No nurse was there. Although not required for treating tonsillitis, Ragen wanted to and recommended he perform a pelvic examination. Ragen injected Pentobarbital, a hypnotic drug, into Diane, and made her take two pills. She became weak and dizzy. Before long he had her take off her underclothing beneath her skirt. At his instruction she climbed onto an examination table, put her heels in stirrups extending out from the end of the table and pulled her buttocks all the way to the end of the table, leaving her extremely exposed. Ragen stood between her legs, jabbing his penis into her vagina. He then sat on a stool between Diane's legs and twice glided his tongue on her vagina. Later, Ragen told Diane he had to spray her throat. After taping her eyes with gauze patches, he stood by the side of the table and put his penis into her mouth, telling her to suck the lollipop.

Although dopey and weak when she got home, Diane telephoned a girl friend. Crying hysterically she explained what Ragen had done. The girl friend's mother called the police. Diane was taken to a Chula Vista hospital for tests. The tests did not confirm her story. Knowing Diane's story and the medical evidence casting doubt on it, the police were not about to arrest Ragen, a respected doctor. They suggested Diane telephone Ragen, accuse him, ask him questions they would prepare and let them record the conversation. Diane called Ragen about noon, May 27, 1966. For eight minutes he denied everything, with an occasional incriminating slip. Finally, he suggested he would call her back about 4 p.m. She

agreed. At 5:40 p.m., Ragen called Diane. They spoke for fifteen minutes. In substance, Ragen emotionally admitted his crime, putting his life in her hands, asserting he would kill himself unless somehow she could charitably forgive him and keep her mouth shut.

The events described above led to Ragen's conviction for statutory rape, narcotic rape and one count of sex perversion. The other count of sex perversion involved five-and-one-half-months pregnant Ruth. In June 1964, suffering cramps and contractions, Ruth telephoned Ragen, her doctor. He suggested meeting at his office at 10 p.m. Not surprisingly, no nurse was there. Ragen had Ruth get onto the examination table and put her feet into stirrups. He gave her an injection, making her dizzy, groggy, light headed and drowsy. She fell asleep. She woke up finding Ragen standing between her legs, his penis penetrating her vagina. Later, he tried to force his penis into her mouth.

Attacking the trial court's admission of the tape recording of his telephone conversations with Diane, Ragen makes three unmeritorious contentions:

█ 1) Ragen contends tape recording his telephone conversations with Diane constituted an unreasonable search and seizure. Relying on *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], and *Berger* v. *State of New York,* 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873], Ragen correctly argues tape recording a telephone conversation is a search within the Fourth Amendment to the United States Constitution. The Fourth Amendment protects against *unreasonable* search and seizure. Neither *Katz* nor *Berger* dictates whether tape recording a telephone conversation is unreasonable where one party to the conversation consents to the recording. In *Hoffa* v. *United States,* 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408, 413-414], the United States Supreme Court said: ''Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. Indeed, the Court unanimously rejected that very contention less than four years ago in *Lopez* v. *United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.'' *Katz* v. *United States, supra,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], and *Berger* v. *State of New York, supra,* 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873], to whatever extent they reflect displeasure with trespass and physical invasion theories applied in *Olmstead* v.

*United States,* 277 U.S. 438 [72 L.Ed. 944, 48 S.Ct. 564, 66 A.L.R. 376], and even *Lopez* v. *United States,* 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381], do not diminish in the slightest the discussion of one party consent in *Hoffa* v. *United States, supra,* 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408, 413-414], and *Lopez* v. *United States, supra,* 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381]. (Cf. *United States* v. *White*[1] (7th Cir. 1968) 36 U.S.L. Week April 9, 1968.) Ragen, in other words, took the chance Diane might publicize their conversation. The tape recording, with assured accuracy, merely told what Diane could say on the witness stand.

■ 2) Ragen contends his telephone statements to Diane were involuntary because Diane's questions and accusations deceived him and incited fear and panic in him. As Ragen argues, the Fourteenth Amendment to the United States Constitution forbids using a mentally coerced confession in a state criminal trial (*Leyra* v. *Denno,* 347 U.S. 556 [98 L.Ed. 948, 74 S.Ct. 716]; *Rogers* v. *Richmond,* 365 U.S. 534 [5 L.Ed.2d 760, 81 S.Ct. 735]). Ragen cites as deception Diane's not telling him the police were recording the conversations. This deception he equates with mental coercion. Deception, however, does not render statements inadmissible if it is not of a type reasonably likely to procure an untrue statement (*People* v. *Arguello,* 65 Cal.2d 768, 775 [56 Cal.Rptr. 274, 423 P.2d 202]; *People* v. *Hays,* 250 Cal.App.2d 96, 98 [58 Cal. Rptr. 241]) and the police conduct is not such as (1) to overbear the will to resist, and (2) to bring about confessions not freely self-determined (*Rogers* v. *Richmond, supra,* 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735, 741]). We are convinced the deception practiced here, Diane's not telling Ragen about the police recording the planned questioning, was not reasonably likely to procure an untrue statement. Neither was the police conduct in having Diane call and ask the prepared questions used here, hiding the police involvement, such as to overbear Ragen's will to resist or to bring about confessions not freely self-determined. The situation, being caught and accused by his victim, not deception, caused Ragen to incriminate himself. In terms of self-determination, Ragen did not have to call Diane and could have hung up anytime, taking the consequences of his own sordid criminality. Indeed, he himself placed the second and overwhelmingly incriminating telephone call. Ragen's statements were voluntary.

[1]Decision not final.

3) Ragen contends his telephone statements to Diane were inadmissible because before taping them the police did not warn him of his constitutional rights as stated in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Conceding he was not in custody or under arrest when the police recorded the conversations, Ragen argues custody is not an indispensable requirement before a *Miranda* warning is required. In *People* v. *Arnold*, 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515], however, the California Supreme Court adopted the requirement and definition of custody found in *Miranda* v. *Arizona, supra*, 384 U.S. 436, 444 [16 L.Ed.2d 694, 706 [86 S.Ct. 1602, 1612, 10 A.L.R.3d 974] : " 'By *custodial* interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (Italics added.)" Ragen was not deprived of his freedom of action in any significant way. He could have hung up. He did not have to call Diane. His statements, therefore, were admissible, considering the totality of circumstances, although he had not been warned of the *Miranda* rights. See *People* v. *Ing*, 65 Cal.2d 603, 612-613 [55 Cal.Rptr. 902, 422 P.2d 590].

Ragen contends the trial court improperly admitted evidence of his sexual misbehavior with patients other than Diane and Ruth. These vile events occurred as follows:

1) In March 1957, Ragen treated eight-months-pregnant Mrs. Darnley. A nurse helped Mrs. Darnley onto an examination table. Mrs. Darnley placed her legs in stirrups with her buttocks on the end of the table. In the absence of the nurse, Ragen examined Mrs. Darnley, rubbed his penis up and down in her vaginal area, and, then very forcefully inserted his penis into her vagina.

2) Also in March 1957, Ragen mis-treated 15-year-old, six-months-pregnant Mrs. Fisher as he had mistreated Mrs. Darnley, except he never accomplished penetration.

3) Also in March 1957, Ragen mis-treated six-to-eight-months-pregnant Mrs. Jenkins as he had Mrs. Fisher.

4) In August 1959, Ragen mis-treated 16-year-old Mrs. Smith for an infection of the cervix. In the absence of a nurse, he had Mrs. Smith get onto the examination table with the stirrups. Ragen gave her an injection, making her relaxed, light-headed and happy. He inserted his penis into her vagina. After blocking her vision with a cloth, he put his penis up to her mouth.

The evidence of Ragen's earlier sexual behavior with patients was admissible. In view of the striking similarities between the offenses charged and the earlier behavior, the evidence proved a common scheme or plan to molest patients, in the absence of a nurse, by getting them onto the examination table with their feet in stirrups and buttocks on the end of the table, rubbing or inserting his penis in their vaginal areas, and, at times, administering intoxicating narcotic or anesthetic substance followed by attempting to penetrate or penetrating their mouths with his penis (*People* v. *Ing, supra,* 65 Cal.2d 603, 612; *People* v. *Cramer,* 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]). In *People* v. *Cramer, supra,* 67 Cal.2d 126, 129-130, the California Supreme Court said: "It is settled that evidence of other crimes is ordinarily admissible where it tends to show presence of a common design, plan or *modus operandi,* and we recently recognized in *Kelley supra* (*People* v. *Kelley,* 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947]) that this rule applies to sex offenses committed with persons other than the prosecuting witness. We there pointed out that, although charges of sex offenses are often unreliable and particularly difficult to disprove, such evidence is admissible as showing a common scheme or plan where the offenses are not too remote, are similar to the offense charged, and are committed with persons similar to the prosecuting witness. (Citation.)

"Several decisions have held that the test of admissibility of evidence of another offense offered to prove common design, plan, or *modus operandi* is whether there is some clear connection between that offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other. Or as the matter is sometimes stated, the other offenses offered to prove pattern, scheme, or plan are sufficiently similar and possess a sufficiently high degree of common features with the act charged where they warrant the inference that if the defendant committed the other acts he committed the act charged. (Citations.) Other cases have spoken of a 'peculiar or characteristic behavior pattern' (citations.), 'bizarre details' (citation) and 'striking similarities' (citations)." ▮ Applying these principles, we hold the trial court properly (1) admitted the evidence of Ragen's earlier sexual conduct with patients, and (2) limited the use of his evidence by instructing as follows: "Now, let's go back to some of the evidence again. With respect to that evidence offered for the purpose of showing

that on occasions other than those mentioned in the indictment, the defendant committed acts upon the bodies of Claudia Darnley, Nancy Jane Fisher, Margaret Jenkins and Lucretia Owings Smith similar to those charged against him in this case, you are not permitted to consider such evidence for the purpose of finding against the defendant distinct offenses or continued criminality, but you may consider it as tending to show, if you decide that it does tend to show, the disposition of the defendant toward Diane Grace Santa Maria and Ruth Casillas, and an inclination on his part to indulge in the method of sexual gratification involved in the crimes of which he is charged, and, hence, as having some bearing on the question whether or not the defendant committed the specific offense of which he is accused in this case. As to such limited purpose for which such evidence may be considered, you will weigh it as you do all of the other evidence in the case.''

Ragen contends the trial court's conduct of the trial, including a large number of its rulings, many of which he claims were erroneous, cumulatively prejudiced him. He attacks the following evidentiary rulings:

■ 1) During *voir dire* examination of an investigating policeman to determine the admissibility of the taped telephone conversations, the trial court refused to allow Ragen to inquire whether the police kept him under surveillance after the conversations were taped. Contrary to Ragen's argument, evidence showing surveillance after he made his incriminating statements is irrelevant to the issue whether the police should have warned him of his *Miranda* rights before the conversations. In short, the evidence would not tend to prove earlier custody.

■ 2) On the ground of hearsay, Ragen contends the trial court improperly allowed Diane's father and girl friend to testify what Diane said when she complained on the night Ragen sexually molested her. The trial court properly permitted Diane's father and her girl friend to state what Diane said about the nature of the offense and the identity of the offender, and no more (*People* v. *Burton,* 55 Cal.2d 328, 351 [11 Cal.Rptr. 65, 359 P.2d 433]). ■ The trial court also allowed the jury to hear a tape recording of Diane's complaint to the police. To impeach Diane, Ragen introduced evidence of inconsistencies between her trial testimony and her taped complaint. He requested the court play most of the tape for the jury. To add needed context, the trial court properly

402

played more of the tape than Ragen wanted (*People* v. *Watson,* 46 Cal.2d 818, 827 [299 P.2d 243]). The trial court, furthermore, instructed the jury to consider the tape solely for impeachment.

3) The trial court refused to allow individual physicians to testify why they excluded nurses during pelvic examinations. Their individual reasons were irrelevant. The trial court properly allowed evidence of a partial community practice to exclude nurses during pelvic examinations.

4) After Ragen introduced Ruth's ex-husband's testimony her reputation for truth and veracity is bad, the trial court permitted the district attorney to ask the ex-husband if Ruth had filed a complaint against him for failure to support their minor child. He answered yes. Because of the exceptional circumstances of the bias toward one of two star prosecuting witnesses, the trial court properly allowed the question (*People* v. *Vanderburg,* 184 Cal.App.2d 33 [7 Cal. Rptr. 287]).

Continuing his review of the trial court's conduct, attempting to grasp something to compound into prejudice, Ragen contends the instructions to the jury were not perfect:

1) Without evidentiary support, the trial court instructed, as applied, the jury might consider the fact, if it be a fact, that among people knowing Ruth, her truth and veracity had not been discussed. This minute surplusage could not have contributed to prejudice.

2) After giving the usual sex prosecution cautionary instruction regarding the difficulty of defending against charges easily made, the trial court told the jury, in addition, not to be deterred, however, if convinced beyond a reasonable doubt, from returning a guilty verdict. Ragen's reliance on *People* v. *Lyons,* 47 Cal.2d 311 [303 P.2d 329], is misplaced. In *Lyons,* the trial court hand-wrote this addition to the printed instructions the jury took with them into the jury room. As *read* here, the addition was proper (*People* v. *Scarborough,* 171 Cal.App.2d 186 [340 P.2d 76]).

3) The trial court did not instruct the jury might consider Ragen's admissions only if found voluntary. Ragen states he objected to the admission into evidence of his admissions on the ground they were not voluntarily made. The trial court ruled otherwise. Ragen did not put evidence of involuntariness before the jury. The issue, therefore, was properly kept from the jury (*People* v. *Eli,* 66 Cal.2d 63, 76 [56 Cal. Rptr. 916, 424 P.2d 356]).

4) The trial court instructed where a case rests entirely or substantially on circumstantial evidence, each fact compounded into a set of circumstances must be proved beyond a reasonable doubt. Ragen asserts this instruction leaves a jury wondering whether circumstantial evidence must be proved beyond a reasonable doubt if the case does not rest entirely or substantially on circumstantial evidence. The general instruction on reasonable doubt, and all the instructions together here, however, made it clear to the jury the evidence of guilt must be believed beyond a reasonable doubt.

5) Contrary to Ragen's argument, *People* v. *Lisenba*, 14 Cal.2d 403, 431 [94 P.2d 569], and *People* v. *Albertson*, 23 Cal.2d 550, 579 [145 P.2d 7], do not require the sex prosecution other offense instruction to state the evidence of other offenses must be ''positive and substantial.''

6) Ragen argues the trial court should have defined the word ''impeachment'' for the jury. This was unnecessary (*People* v. *Shannon*, 147 Cal.App.2d 300, 305 [305 P.2d 101]). The trial court, furthermore, defined impeachment evidence for the jury: ''It is evidence which you consider for the purpose of measuring, or testing, or weighing the credibility of a witness. . . .''

Ragen unmeritoriously cites as misconduct the following statements by the trial court while instructing the jury: ''Parenthetically, sometimes, I think I'm going to organize the instructions under a perfectly marvelous, understandable order so that they flow like the waters of the River Po—which is in flood again, I understand—but today I guess isn't one of them.'' This statement does not support Ragen's speculation the court did not think the instructions were worth the trouble to organize.

''Now, this is an instruction which, no less than any of the others, you must take account of. But I'm going to read it rather hurriedly because there is one phrase in there which for 22 years has driven me out of my mind as constituting an insult to jurors of decent intelligence and with a sincere approach to their responsibility. I think you will recognize it when I get to it.

''You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the declarations of a lesser number of witnesses, or other evidence, or a presumption which does not appeal to your mind with more convincing

force. This rule of law does not mean that you are at liberty to disregard the testimony of the greater number of witnesses simply from caprice or prejudice, or, certainly, from any desire to favor one side as against the other. The rule does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. The final test is not in the relative number of witnesses but in the relative convincing force of the evidence. That's a dandy.'' This instruction does not support Ragen's statement the trial court disparaged the importance of instructions. Neither does the quoted language divert attention away from its message, as Ragen asserts. ''Now I think I'll read down through these instructions, which define the offenses, and then come back to some other evidentiary matters just to break up the tedium.'' This statement, Ragen speculates, means that which went before was unimportant and boring. This simply is unwarranted speculation.

Ragen contends the trial court treated the entire trial with reprehensible levity and prosecution bias. He supplies a long list of allegedly objectionable leading questions asked Diane and Ruth. He does not supply their contexts, the previous answers upon which most of them are based. He parades before us a barrage of reporter's transcript references intending to show trial court bias in ruling on objections to leading questions, questions asked and answered, and, in general, trial court attitude. There is no substance whatsoever in this treatment, taken mostly out of context from the record. It does not add up to prosecution bias.

Regarding levity, Ragen contends the trial court's remarks worked to ''dull the edge of advocacy, distract concentration on the business in hand. and dilute the seriousness and solemnity in and with which any important trial should be conducted.'' We believe all trials deserve the attributes Ragen erroneously complains his trial lacked.

During his first instruction to the jury not to discuss the case before it was submitted to them, the trial court remarked: ''Well, the reason you are not to discuss the case, or the witnesses, or the testimony, or the exhibits, or the neckties of the lawyers, or the haircut of the judge, is this: We want taken into the jury room for deliberation, after all of the evidence is in, after all of the instructions have been given, twelve independent views of the evidence.''

Toward the end of the case the trial court told the jury: ''I have told counsel that because of the length of the matter I

would give them one day free to prepare for argument and discussion. If things go forward in that fashion without some unexpected jolt, we might then finish today with the testimony, take Tuesday away from the case, Wednesday resume for argument and instructions. I would not send you out at the close of a full day of argument and instructions. You will be ready to climb the walls after you have sat all day listening to me and to the lawyers. So, it's possible that you may begin your responsibility in the case Thursday morning." After both sides rested the court told the jury: "Well, I won't ask counsel to jump up and start discussing the case with you this afternoon.

"I think if we give them tomorrow to work on it, they'll be able to boil it down a little bit, and we won't have to listen to so much. I shouldn't really joke about it, I suppose, because actually I'm sure that after a long trial as this one has been, you will find both counsels' remarks very helpful to you. And the more study they can put in on their review, the more help we'll all get."

These examples typify Ragen's citations of alleged trial court levity. In context, without Ragen's briefed exaggerations, the citations do not prove jocular misconduct. This was a long trial seriously conducted with dignity. Defense counsel, district attorney and court occasionally spliced flecks of humor into the trial, not detracting, however, from its serious purpose.

Judgment affirmed.

Coughlin, J., concurred.

Whelan, J., deeming himself disqualified, did not participate in this case.

A petition for a rehearing was denied June 20, 1968, and appellant's petition for a hearing by the Supreme Court was denied July 17, 1968. Peters, J., was of the opinion that the petition should be granted. The United States Supreme Court denied a writ of certiorari on December 16, 1968.