[Crim. No. 20893. Second Dist.. Div. Five. Oct. 31, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVE AESCHLIMANN et al., Defendants and Appellants.

## Counsel

Richard S. Buckley, Public Defender, James L. McCormick, James E. Haney and Richard A. Curtis, Deputy Public Defenders, and Harold Drooz for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**STEPHENS, J.**—By information, defendants Steve Aeschlimann and Marie Junge were charged in count I and count II, respectively, with the murder of their 11-month-old child, Todd Aeschlimann (Pen. Code, § 187), and Marie Junge was charged in count III with inflicting traumatic injury upon the infant (Pen. Code, § 273d). Defendants pleaded not guilty; the jury found defendants guilty as charged and the murder to be in the first degree as to each defendant. The court denied defendants' motion for new trial, and simultaneously reduced the degree of the murder offenses to second degree. Probation was denied, and defendants were sentenced to the terms prescribed by law on counts I and II; the court withheld imposition of sentence on count III. Defendants appeal from the judgments.

At trial, the People introduced evidence that defendants inflicted traumatic injuries upon their infant son (hereinafter, Todd), and that those injuries resulted in Todd's death.

Kathleen Jacoby, defendants' neighbor, testified at trial that "around the end of" February 1970, defendants were at her apartment with Todd and Todd was "fussing from being in a strange place." Aeschlimann told Junge to hold Todd's arms, and Junge did so while Aeschlimann struck Todd "possibly a dozen times . . . from below his shoulder to about his knees . . . as hard as he could." Jacoby asked Aeschlimann to "stop it," and Aeschlimann "looked up . . . and then he stopped." The blows resulted in "red welts and white, where like the blood had left the skin from being hit. Welts all up and down." Junge said to Aeschlimann that she wished that he wouldn't hit Todd "so hard," and Aeschlimann responded that he "[knew] what he was doing." Jacoby further testified that she had seen Todd on a number of occasions between February and July

1970, and that on each occasion Todd appeared to have new and different bruises on his body. Jacoby testified that on July 9, 1970, she heard the sounds of Todd's crying and gasping and the sounds of slapping from within defendants' apartment; there was a series of three spankings, and with each spanking, Todd would "cry harder, much harder," but at the end of the third spanking, Todd "just stopped crying." Jacoby further testified that on July 16, 1970, at approximately 5 or 5:30 p.m., she again heard the sound of Todd's crying from within defendants' apartment. She heard a series of spankings, and with each spanking, Todd "would sob and cry louder and was just squalling, just crying his lungs out towards the end." She then heard Junge shout, "Shut up, shut up, goddammit or I will kill you." There was a "thud against the [common] wall [between defendants' apartment and the witness' apartment]. And I heard Todd, I guess you could call it, whimpering and then there was silence as he quieted." Prior to the "thud against the wall," Todd had been crying hysterically, but the hysteria ceased immediately after the thud.

Aeschlimann's mother, Dorothy E. Aeschlimann, testified that in early July 1970, she spent about two weeks in California visiting her sons. Todd was then 10 months old. She noticed that Todd had several bruises on his body: "one on his back, quite a good size brown one, about as big as a quarter [and] several on his leg," a brown bruise at about the middle of Todd's back, and "one on his [forehead] that was quite a large [dark blue] one . . . about as big as a 50-cent piece." The day the witness left California, she noticed Todd's buttocks were "quite dark in color" and appeared to be bruised; she once observed Junge spank Todd viciously, and purple discoloration of Todd's buttocks resulted; she saw Junge spank Todd's hands, which then became "real red like a tomato." On another occasion, the witness saw Junge pour a pail of very cold water over the top of Todd's head while he was in a child's round vinyl pool, and Todd turned blue and gasped for breath. On another occasion, the witness saw Junge spank Todd "as hard as she could," and the witness "thought [Junge] wouldn't stop"; then Junge came in a second time when Todd began fussing, and Junge spanked him again; the purple bruises on Todd's "rear" looked "a mess," and it "looked as if blood vessels could have been broken."

Mary Hollinfer, another of defendants' neighbors, testified that she once observed Todd to have "a black eye." On another occasion, the witness was passing defendants' front door and she "heard Todd screaming and crying." The witness observed Junge "beating [Todd's hands] so they were as red as a tomato." Todd "was crying at the top of his lungs," and the witness asked Junge "what was the matter with her, was she some kind of nut or

something beating the baby like that." On another occasion, the witness' daughter, Irene, was babysitting with Todd, and brought him to the witness' house. The witness observed Todd to have "cut open marks" on the buttocks, and she applied an ointment to Todd's abrasions. On another occasion, when the witness, Junge, and Todd were at a laundromat, the witness observed that Todd was "very badly bruised" on his "cheekbone, eye and up. . . ." Sometime in June 1970, the witness observed Junge cleaning spilled paint and Todd covered with paint; Junge said that Todd was a "bad little boy, and that she wished to God that she could get rid of him." Junge then struck Todd "with such force that it knocked the kid over against the wall." Todd "temporarily lost his breath [and] at first he couldn't cry . . . We shook him, and then he started crying." The next day, Todd's face was red, and it started to turn bruised."

Irene Hollinfer testified that in March or April 1970 she began babysitting for defendants and noticed that Todd "was black and blue around the face. His whole face was just black and blue. And he was split open on the buttocks. And that was black and blue." Aeschlimann instructed the witness to "beat the baby if he cries, and beat him until he stops crying. Do not pick him up, show him any love or affection. This is not proper child psychology, and that is it." The witness babysat for defendants approximately 10 or 12 times, and Todd was "always bruised." On one occasion, the witness heard Aeschlimann tell Junge that Junge "had to beat the baby every time he cried or put his hands in his mouth, and that he wanted a perfect child when he came home from work. He did not want a baby that would always cry. It was a "common occurrence" at "all hours of the day and night" to hear Todd's crying, the sounds of spanking, and Aeschlimann's shoutings. On five different occasions from March till June 1970, the witness saw Aeschlimann strike Todd: a couple of times on the buttocks, and the other three times he hit Todd "back and forth real hard across the face"; Todd's face then puffed up and started to turn black and blue; when Aeschlimann struck Todd, Aeschlimann said: "Shut up, I can't stand you crying." The witness recalled seeing Todd's buttocks with scabs and then later saw the scabs had been broken; she noticed the buttocks were red and swollen at the time she noticed the injuries had been broken open. On one occasion, the witness applied medication to Todd's buttocks.

Frances Poll, another of defendants' neighbors, testified that sometime in "the first part of June" 1970, she observed that Todd's "arms and legs had black and blue marks on them." The witness further testified that she was visiting witness Jacoby on July 16, 1970 and that she, too, had heard Todd's crying. The witness heard Junge shout, "Shut up, goddamn you

shut up, or I will kill you." The witness then heard "a thud against the [common] wall [between defendants' apartment and Jacoby's apartment], and then Todd wasn't crying at all."

May Orr, another of defendants' neighbors, testified that she once observed Aeschlimann "grab" Todd's face and "jerk" Todd's head around, and Aeschlimann said "he was going to show us how he could control the child by using the child psychology he had studied." On another occasion, the witness heard the sound of Todd's crying and the sounds of a "paddling"; Junge "just shrieked at the goddamn little bastard to shut up and there was a couple more whacks went right along with that."

Norman Ballard, another of defendants' neighbors, testified that he first saw Todd sometime in February 1970, and at that time "Todd had a couple of black eyes." On another occasion, Aeschlimann told the witness that "he didn't like his baby crying intently and that he just wouldn't permit it."

Whittier Police Sergeant Plummer, the investigating officer, testified that on August 12, 1970, witness Ballard informed him that on one occasion while he was with Aeschlimann, Ballard's daughter was crying, and Aeschlimann said: "Boy, I can't stand crying. I won't tolerate it." Ballard replied that "it is a natural thing for a baby to cry, and they are going to do it. You can't stop it [and Aeschlimann] replied, 'By God, I can.' "

Los Angeles Deputy Sheriff Hollingsworth testified that at approximately 11:30 p.m. on July 18, 1970, he and Deputy Mercer intercepted defendants' speeding automobile. Junge was holding a "little boy" who "appeared not to be breathing." The deputies then drove defendants and Todd to the Presbyterian Intercommunity Hospital, which took approximately four minutes.

Dr. John Trapani of the Presbyterian Intercommunity Hospital testified that he was in attendance on the night that Todd was brought in; that Todd "appeared dead on arrival. There were some bruises on the child. That's about it." He pronounced Todd dead at 11:55 p.m. on July 18, 1970.

Los Angeles Deputy Sheriff Mercer (partner of witness Deputy Hollingsworth) testified that at approximately 11:45 p.m. on July 18, 1970, he heard Hollingsworth ask Aeschlimann, "What happened to the baby?," and Aeschlimann replied that "the baby had fallen off a counter." During the conversation, Aeschlimann said: "It is all my fault. It is all my fault." "[A]fter [defendants] had been advised that the victim was deceased, [Aeschlimann] suddenly turned and ran toward a wall, began striking it

with his fists. He then fell on top of a couch still striking, flailing his fists and striking the couch and then went down to the floor." Aeschlimann was given "an injection," but revived and "came running out . . . with his fists flailing . . . and started out the doors of the hospital. We . . . caught up with him and restrained him again by the use of handcuffs."

Los Angeles County Medical Examiner Dr. William Lawrence testified that he examined Todd's corpse; that, in his opinion, Todd had suffered severe traumatic injuries that had caused lacerations of Todd's duodenum; that the lacerations allowed "the escape of intestinal contents into the abdominal cavity, setting up an inflammation due both to bacteria and to chemical irritation of the abdominal cavity. And terminally, a septicemia or blood stream invasion by bacteria with shock and cessation of breathing and heart activity." Dr. Lawrence testified that he believed the injuries had been inflicted by a human being; that he did not believe that Todd could have inflicted the injuries upon himself; that it was possible that Todd's injuries were inflicted as a result of Todd's having been thrown against a wall; that the witness found three open tears in Todd's duodenum; and that he would expect death to occur within 48 hours of such tears. The witness further testified to finding another tear in Todd's duodenum that had begun to repair itself, and estimated that this particular tear had been repairing itself for a period of time that could vary from 48 hours to one week. The witness also testified that "the previous lacerations would have resulted in spillage of intestinal contents into the abdominal cavity," and "there was a systematic weakening of [Todd's] body . . . . [s]o that when the most recent open wounds came into being . . . the body [was not] in as good a position to withstand that infection as it would have been had not the earlier lacerations taken place."

Victor Rosen, a medical doctor and consultant to the Los Angeles County Medical Examiner's office, testified that "a partial tear of the duodenal wall, which subsequently gave way with perforation and an inflammatory reaction, and areas of hemorrhage in the wall of the duodenum indicate that the injury occurred at least 48 hours after—the perforation occurred at least 48 hours after the application of the force to produce the injury." "The upper limits of this time are not 100% determinable, but could be even up to 72 hours, and that subsequent blowout of this weakened area in the duodenal wall occurred within a reasonable period of time under 12 hours before death itself."

### The Defense

In defense, defendants testified that they had not caused traumatic in-

juries to be inflicted upon Todd, and introduced medical testimony that Todd did not die as the result of traumatic injury but instead died as the result of a blood vessel disease that had external symptoms which were similar to the external symptoms of a traumatic injury.

## The Contentions on Appeal

■ Defendant Aeschlimann first contends that "the court committed prejudicial error by giving instructions relating to [first degree murder by] torture . . . , there being insufficient evidence to support such instructions . . . ." We disagree. Penal Code[1] section 1093, subdivision 6 provides in part that the judge must charge the jury "on any points of law pertinent to the issue, if requested by either party," and section 1127 provides in part that "[e]ither party may present to the court any written charge on the law," and "[i]f the court thinks it correct and pertinent, it must be given." Section 189 provides in part that "[a]ll murder which is perpetrated by means of . . . torture . . . is murder of the first degree," and the California Supreme Court has held that "[m]urder is perpetrated by torture 'when "the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." [Citations.]' " (*People* v. *Daugherty*, 40 Cal.2d 876, 886 [256 P.2d 911]; see also, *People* v. *Mattison*, 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]; *People* v. *Turville*, 51 Cal.2d 620, 632 [335 P.2d 678].) And in Webster's New International Dictionary (3d ed. 1961), the meaning of the verb "torture" includes to "punish or coerce by inflicting excruciating pain." There was an issue at trial as to whether or not Aeschlimann carried out an intent to "inflict grievous pain and suffering upon" Todd in order to "persuade" (in the context of "coerce") Todd to conform to Aeschlimann's desired mode of behavior, and we cannot rule that as a matter of law the trial court erred in allowing the People's requested instruction on murder by torture.

■ Aeschlimann next contends that although "the jury was orally instructed on the law of manslaughter at the close of the case," "the judgment should be . . . reversed and the case remanded for a new trial solely because the jury failed to receive proper instructions on the law of manslaughter when it requested them. . . ." Specifically, Aeschlimann's contention arises out of the following chronology of events: At the close of the trial, various instructions, including an instruction on manslaughter, were read to the jury; at approximately 3 p.m. on the day that the jury ultimately returned its verdict, the jury asked to be reinstructed on man-

---

[1]All section references are to the Penal Code unless otherwise indicated.

slaughter; the court and all counsel then met in chambers and assembled a packet of manslaughter instructions; at approximately 3:45 p.m. that same day, the bailiff took the instructions into the jury room, but was informed that the jury had already arrived at its verdicts; at approximately 3:55 p.m., the jury gave its verdicts to the court. Defendant argues that "despite the blamelessness of all parties, . . . the verdict was unduly influenced by the lack of response to the jury's request for clarification, it being reasonable to suppose that the jury felt that the court did not consider manslaughter an important factor in the case when it received no response to its request." We disagree. Defendant Aeschlimann admits that "the jury was orally instructed on the law of manslaughter," and does not attack the correctness of the instruction. Section 1093, subdivision 6 provides in part that "[t]he trial judge may cause copies of instructions so given to be delivered to the jurors at the time they are given," and the California Supreme Court has interpreted this code section to mean that "furnishing written instructions is a matter within the discretion of the trial court, . . ." (*People* v. *Anderson,* 64 Cal.2d 633, 640 [51 Cal.Rptr. 238, 414 P.2d 366].) The trial judge neither abused his discretion in originally reading the manslaughter instructions to the jury, nor abused his discretion in taking approximately 45 minutes to fulfill the jury's request for sending in the printed instructions on manslaughter. Therefore, the fact that the jury had not received the said instructions at the time it arrived at its verdict is not in itself reason for reversal, and defendant Aeschlimann's argument that "the jury felt that the court did not consider manslaughter an important factor in the case when it received no response to its request" is unfounded in light of the following other instructions that were given to the jury:

"I have not intended by anything I have said or done, or by any questions that I may have asked, to intimate or suggest what you should find to be the facts on any questions submitted to you, or that I believe or disbelieve any witness.

"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion.

"If the court has repeated any rule, direction or idea, or stated the same in varying ways, no emphasis was intended and you must not draw any inferences therefrom. You are not to single out any certain sentence or any individual point or instruction and ignore the others. You are to consider all the instructions as a whole and are to regard each in the light of all the others.

"The order in which the instructions are given has no significance as to their relative importance."

"Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

We must assume that the jury rendered its verdict according to these instructions, whether the instructions as given were sent to the jury room in their printed form or not.

Defendant Aeschlimann also contends that the judgment should be reversed "because of undue influence exerted by some jurors" and because "there were jurors who had given false answers on *voir dire* to the question whether they would be inconvenienced or suffer a hardship by becoming involved in a protracted trial." Specifically, defendant contends that "one or two [jurors] were anxious to conclude the proceedings [on Friday]" and "were so anxious to conclude the proceedings that they did not want to return to this court and continue their deliberations on Monday." In support of his contention, defendant relies upon the affidavit of juror Judy Thomas.[2] However, such an affidavit falls far short of establishing as a matter of law that the verdicts were decided by some "means other than a fair expression of opinion on the part of all the jurors" (Pen. Code, § 1181, subd. 4), or that "disqualification of a juror was concealed by false answers on *voir dire* examination." (*People* v. *Castaldia*, 51 Cal.2d 569, 572 [335 P.2d 104].) Assuming that the trial judge properly considered the Thomas affidavit (*People* v. *Hutchinson*, 71 Cal.2d 342, 351 [78 Cal. Rptr. 196, 455 P.2d 132]), his ruling to the effect that the affidavit did not establish anything that was "likely to have influenced the verdict improp-

---

[2] The Thomas affidavit was not included in the record on appeal. On the court's own motion, the record was augmented to include that affidavit, which states in pertinent part: "It was getting close to 4 p.m. and two or three jurors kept saying the judge will make us come back Monday. One person said he might lose his job. Then the foreman said, 'It doesn't look like we can have the instructions, we will take another ballot.' The ballot was by a show of hands. People were getting angry. One kept saying he was not getting paid by his employer because he had been on jury duty too long. I didn't have my hand up for first degree murder. I think I was one of the last two to finally put my hand up. I had said we should come back Monday, but those jurors who wanted to go home said, 'How can you feel like that?' I then raised my hand and voted for the verdict and agreed to it in order to prevent the jury from being sent home for the weekend to return Monday.

"As a result of the pressure being put on by those who didn't want to come back on Monday and the foreman's statement about not getting the instructions, it is my opinion that I hurried my verdict in order to prevent the jury being sent home for the weekend to return Monday. It is also my opinion that the verdict could have been different had the instructions been sent in to us to be discussed."

erly"[3] (Evid. Code, § 1150) and his denial of defendant's motion for a new trial did not constitute an abuse of judicial discretion.

■   Defendant Aeschlimann next contends that the trial court erred in admitting the following testimony of the People's witness, Irene Hollinfer:

"Q BY [DEPUTY DISTRICT ATTORNEY]: Did you ever see [defendant] Aeschlimann strike Todd?

". . . . . . . . . . . . . . . . . . . .

"A I saw it five different times.

". . . . . . . . . . . . . . . . . . . .

"[DEPUTY PUBLIC DEFENDER]: Your Honor, I object to this testimony. It is irrelevant and immaterial and inadmissible under Evidence Code 1101

. . . .

"THE COURT: The objection is overruled . . .

". . . . . . . . . . . . . . . . . . . .

"Q All, right, can you at this time recall in your mind the separate five incidents or the five separate times, and what occurred on each occasion? As much as you can recall, we would like to know about it.

"A I can remember the times—I can just remember what he did. Just spanked the baby back and forth real hard across the face.

"Q Did he hit the baby in the face on five occasions that you saw, or did he hit the baby somewhere else on some of the occasions?

"A Somewhere else on some of the occasions. On the buttocks a couple of times, and the other three times were across the face."

Defendant Aeschlimann contends that "[o]ver objection . . . the court allowed the prosecutor to elicit . . . testimony regarding five occasions on which [defendant] struck the deceased" and defendant "maintains that such testimony was admitted in violation of Evidence Code section 1101, which prohibits the admission of evidence of specific instances of prior

---

[3]The affidavit itself is equivocal and does not establish with any definiteness that a different verdict would have been reached by this juror: "It is also my opinion that the verdict could have been different had the instructions been sent in to us to be discussed."

conduct to prove conduct on a subsequent occasion . . . ."[4] We disagree. In general, the criminal law prohibits the doing of a particular act with a particular intent. The sole purpose of a criminal trial is to determine whether a defendant charged did in fact do the act with the requisite intent, and the rules of evidence serve both to exclude irrelevant evidence and to exclude evidence that is relevant but inadmissible under policy reasons determined by the Legislature. Evidence Code section 1101 allows a defendant to exclude from trial all evidence presented for the purpose of demonstrating his evil past. The legislative purpose of this section is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history. (Law Revision Com. comment to Evid. Code, § 1101.) Defendant Aeschlimann errs, however, in arguing that the testimony of the five beatings was evidence of prior acts within the meaning of this section. Defendants were tried on the theory of "murder . . . perpetrated by . . . torture . . . ." (Pen. Code, § 189.) As authority previously quoted establishes, the prohibited act in the crime of torture is the infliction of grievous pain and suffering; however, "torture requires something in the way of pain endured over a period of time." (LaFave, Criminal Law (1972) p. 567.) As a consequence, the prohibited act in the crime of murder by torture is really the course of conduct of inflicting grievous pain and suffering upon a victim that is the proximate cause of the victim's death. Dr. Lawrence testified that "the previous lacerations [of Todd's duodenum] would have resulted in spillage of intestinal contents into the abdominal cavity [and] there was a systematic weakening of [Todd's] body . . . [s]o that when the most recent open wounds came into being . . . the body [was not] in as good a position to withstand that infection as it would have been had not the earlier lacerations taken place." Therefore, the testimonial evidence of the five beatings that defendant had administered to Todd was not evidence of "prior acts" within the meaning of Evidence Code section 1101, but was instead evidence of the crime with which defendants were charged: a course of conduct of inflicting grievous pain and suffering that proximately caused Todd's death.

---

[4]Evidence Code section 1101: "Evidence of character to prove conduct. "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

■ Defendant Aeschlimann next contends that the trial court erred in admitting certain testimony into evidence; specifically, the testimony to which defendant objects arose in the following context: on direct examination, defendant testified that on the day of Todd's death he had been playing with Todd by holding Todd over his head, and that Todd had accidentally slipped from his hands and had fallen to the floor; on cross-examination, defendant again testified that Todd had fallen to the floor as the result of slipping from his hands, denied that he had seen Todd "fall off of anything that evening other than falling out of [his] arms," and could not remember talking to Deputy Hollingsworth "about how Todd may have died." On rebuttal, Deputy Mercer testified that on the day of Todd's death he had heard defendant Aeschlimann say that "the baby had fallen off the counter." Defendant contends that Deputy Mercer's testimony was admitted into evidence in violation of Evidence Code section 770. We disagree. Evidence Code section 770 provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or (b) The witness had not been excused from giving further testimony in the action." During cross-examination, defendant Aeschlimann professed no discussion with Deputy Mercer concerning Todd's having fallen from a counter. It therefore would have been fruitless for the prosecution to interrogate him as to the specific statements testified to by the deputy. In addition, under Evidence Code section 770, there is no need to lay a foundation for the impeaching testimony. Deputy Mercer's testimony was properly admitted as evidence of an inconsistent statement. (Evid. Code, §§ 770 and 1235; *People* v. *Green,* 3 Cal.3d 981 [92 Cal. Rptr. 494, 479 P.2d 998].)

Defendant Aeschlimann next contends that the court erred in allowing witness Sergeant Plummer to testify to the effect that he had heard witness Norman Ballard say that he (Ballard) had told defendant Aeschlimann that "it is a natural thing for a baby to cry, they are going to do it [and] [y]ou can't stop it," and that defendant Aeschlimann replied to Ballard: "By God, I can." Plummer's testimony was admitted as evidence of a prior inconsistent statement to Ballard's in-court testimony that Aeschlimann had said only that "he didn't like his baby crying intently and that he just wouldn't permit it." Aeschlimann asserts that it was error to admit Plummer's testimony as a prior inconsistent statement because Plummer's testimony as to Ballard's previous statement was not in fact inconsistent with Ballard's testimony at trial. While we conclude that any inconsistency results from strained reasoning, even though there was error in admission it was obviously not prejudicial.

Defendant Aeschlimann contends that the trial court erred in denying his objection to the prosecution's "being permitted to commence its rebuttal case without an offer of proof as to the facts to be rebutted in order to determine whether or not rebuttal should be allowed." Defendant's contention fails for both lack of cited authority and reason.

■ Defendant Aeschlimann contends that the trial court erred in allowing the prosecution to introduce evidence on rebuttal that exceeded the scope of the defense. In particular, defendant contends that the prosecution should not have been allowed to introduce further evidence that the child died as the result of trauma as rebuttal to defense testimony to the effect that the child had died of a blood vessel disease; defendant contends that this was simply a "rehash of medical opinion." However, insofar as the prosecution's evidence contradicted the defense evidence that the child had died of a blood vessel disease, the prosecution's evidence was proper rebuttal, and insofar as the prosecution's evidence was a "rehash of medical opinion," "the court [has] discretion [to] regulate the order of proof" (Evid. Code, § 320), and we find no abuse of that discretion.

■ Defendant Aeschlimann contends that the "court erred in admitting physical evidence consisting of [autopsy] photographs and jars of preserved tissue." We disagree. In light of the extensive medical testimony at trial, we find no abuse of discretion in the trial court's admitting real evidence upon which most of the medical opinion was founded. (Evid. Code, § 352.) One of the major issues was the cause of death; namely, did the infant die as a result of a lacerated duodenum caused by trauma or physical force, or did he die as a result of adrenal vein thrombosis? The exhibits aided in the analysis of this issue and were properly before the witnesses for their use in that determination. It follows that the evidence was properly admitted. (*People* v. *Arguello,* 65 Cal.2d 768, 775-776 [56 Cal.Rptr. 274, 423 P.2d 202].)

■ Defendants Aeschlimann and Junge both contend that the evidence was insufficient to sustain their convictions of second degree murder. We disagree. There was adequate evidence that both defendants engaged in a course of conduct of inflicting grievous pain and suffering upon the child, and there was medical evidence from which the jury could conclude that Todd died as the proximate result of old and new injuries to his duodenum. This is substantial evidence in support of the verdict.

■ Defendant Junge contends, though, that "[a]ssuming that the 'thud' [against the wall] occurred at approximately 7:30 p.m. [fn. omitted] on the

night of July 16th . . . and death followed at approximately 11:30 p.m. on the night of July 18th, fifty-two hours would have elapsed between the time of trauma and the time of death—four hours longer than Dr. Lawrence's extreme outside limit of forty-eight hours . . . ." We disagree. Dr. Lawrence's testimony was that he would expect death to occur within 48 hours of a *perforation in the duodenum*. Dr. Rosen testified that "areas of hemorrhage in the wall of the duodenum indicate that . . . the perforation occurred at least 48 hours after the application of the force to produce the injury." Therefore, since Todd's duodenum may not have torn until 48 hours after the infliction of the trauma, and since Todd may have lived up to 48 hours after the duodenum did tear, then Todd could have lived up to 96 hours after suffering the trauma that caused the final tears in the duodenum; the 52 hours between the time of the thud and the time of Todd's death are well within the outside time limit of 96 hours.

The judgment is affirmed.

Kaus, P. J., and Cole, J.,* concurred.

A petition for a rehearing was denied November 24, 1972, and the opinion was modified to read as printed above. The petition of appellant Aeschlimann for a hearing by the Supreme Court was denied December 29, 1972.

---

*Assigned by the Chairman of the Judicial Council.