[Crim. No. 4001. Fourth Dist., Div. Two. Aug. 14, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY GENE STULLER, Defendant and Appellant.

## COUNSEL

Hollopeter, Terry & Schneider and Harvey A. Schneider for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William V. Ballough, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, J.**—Convicted by jury of forcible rape of a 19-year-old girl (Pen. Code, § 261, subd. 3) and oral copulation of a 14-year-old child (Pen. Code, § 288a), defendant's application for probation was denied, and he was sentenced to concurrent terms in state prison.

About midnight on January 11, 1969, the defendant knocked on the front door of the 14-year-old copulation victim's Palm Springs residence and asked for her parents. The girl (Heidi) did not open the door, but merely looked through the "peekhole" or aperture in the door. She informed the defendant that her parents were not in and inquired if he wanted to leave a message. Defendant said, "No," gave a fictitious name, and left. The girl went to bed around 1 a.m. and was awakened somewhat

later by the defendant. He pointed a gun at her, told her to be quiet, and ordered her into the kitchen. While still holding the gun on her, he committed several indecent acts, including an act of oral copulation. After completing the aforesaid indignities, defendant told the girl that he was going to rape her. She broke free, ran next door, and reported the incident to a neighbor. Heidi made an in-court identification of the defendant on the basis of her observations. She testified that she was able to remember his appearance and build from seeing him both on the porch and in the kitchen where the lights were on.

Around 7:45 p.m. on January 23, 1969, the 19-year-old rape victim (Mary) arrived at her Palm Springs apartment after finishing her day's work as a telephone operator and dining with her sister. She washed her hair and did some ironing. About 9 p.m. the defendant knocked on the door. He told her the lights of her car were on. She went out, turned them off, and returned to her apartment. The defendant again appeared at the door and asked if he could borrow a tablet to write a note, stating that the manager was not in and that he was interested in renting one of the apartments in the complex where Mary resided. The girl gave him a pen and stated he could use the stenographer's tablet on the table. He also requested a drink of water. After drinking the water, he placed the glass on the kitchen sink. After making some notation on the steno pad, he walked to the front door, shut it, and pulled a small gun from his jacket. He warned the girl not to scream or to make any outcry. Holding the gun on her, he forced the girl to have intercourse. Upon completing the act, he admonished the victim not to report the incident and left. The girl waited until he was gone and then went to a neighbor's residence. The neighbor reported the crime to the police and then took the girl to the hospital for examination. The girl furnished the authorities with a physical description of the assailant from which a composite sketch was prepared.

Both victims lived near each other in the Palm Springs area; in fact, the two girls were acquainted, Mary having at one time acted as a babysitter for Heidi; however, neither girl had ever seen the defendant prior to the separate assaults, although he had apparently rented an apartment in the same residential area where the girls lived shortly before the attacks.

Apparently on the basis of the physical description of the assailant furnished by the two victims, and from the composite drawing or drawings of the attacker prepared from details supplied by Mary, the police began a routine investigation of males residing in the immediate vicinity who might fit such description.[1] In addition to the physical description of

---

[1]At the time of the rape attack, the assailant was described by Mary as having reddish-blond hair, a receding hairline, and needing a shave. She said he was wearing

the assailant furnished by the victims, the police had two other "leads": (1) A Palm Springs identification technician had discovered two latent impressions on the drinking glass in Mary's apartment; and (2) on the day following the attack on Mary, the authorities also found a page or sheet from her stenographic pad in a vacant lot next to her apartment; this sheet had unsigned notations on it to the effect that the writer had visited an apartment (inferentially the manager's), the latter had not been at home, and the writer was interested in renting an apartment.

On January 28, 1969, a Palm Springs officer visited the defendant's apartment and told him he was being questioned as a suspect because there had been some sexual attacks in the area where he lived and that he fit the description of the assailant. However, the visit was obviously investigatory in nature as the defendant was not arrested.

The following day the Palm Springs police received a call from an employee of the Holiday Inn to the effect that the defendant had applied for a job as a bartender. A local ordinance required that hotel bartenders register with the police. Registration included fingerprinting. The officer told the caller to have the defendant visit the station and fill out the required forms. After receiving the Holiday Inn call to the effect that the defendant intended to register for employment as a bartender, the officer left instructions with the police clerk that the job application form be modified to indicate that the form was to be written rather than printed. (Ordinarily, the forms bore a notation to the effect that they were to be printed.) The purpose of making the change was to enable the police to obtain a specimen of the defendant's handwriting so that the specimen could be compared with the note found in the vacant lot next to the rape victim's apartment. The police also wanted the defendant's fingerprints in order to compare them with the prints lifted from the glass found in Mary's apartment.

Later the same day (January 29), the defendant appeared at the police station, wrote out the answers required by the job application form, and furnished the police with his fingerprints. The two latent impressions from the glass matched the defendant's prints on the fingerprint card.

Apparently acting on the basis of the fingerprint identification and their prior knowledge reflecting that the defendant fit the assailant's physical description, the police proceeded to the defendant's apartment without a

a suede jacket with a beige fleece lining. After defendant's arrest, the description furnished by the two victims as to the assailant's height, size, build and physical characteristics reasonably matched those possessed by the defendant.

warrant in the early morning hours of January 30 and placed him under arrest for the two separate assaults. He was advised fully of his constitutional rights and informed that he would have to accompany the officers to the station. After being so informed, the defendant indicated he wanted to wear his jacket to the station. One of the arresting officers searched the jacket prior to handing it to him to make certain it did not contain any weapons; in one of the pockets was a .22-caliber revolver. This weapon was similar to the one used by the assailant in the rape incident. The jacket was fleece-lined and was identified at trial by Mary as the one worn by the attacker.

After his arrival at the station, the defendant was fingerprinted and furnished with a "statement of [constitutional] rights" form which he signed, thereby acknowledging that he had been fully advised of his rights. The writing on the statement of rights form and the writing on the job application form required by the local ordinance was compared with the note in the assailant's handwriting found in the vacant lot next to Mary's apartment. An analysis of the defendant's handwriting on the job application form and on the statement of rights form matched the writing on the note found in the vacant lot next to Mary's apartment. An expert testified that the note found in the lot was written by the defendant.

On the day following the defendant's arrest, Mary was shown 100 "mug" shots or photographs by the police. She identified the defendant as the assailant from one of the photos.

The defendant testified in his own behalf. In denying his involvement in either offense, the defendant offered the defense of alibi, claiming that he had been with his mother at the time of the commission of both crimes. His mother corroborated his alibi, testifying that he had been with her when both assaults were perpetrated.

The defendant's attack on the judgment takes the following form: (1) It was error for one judge to *voir dire* the jury and for another to preside over the trial; (2) his fingerprints and handwriting sample were obtained in violation of his constitutional rights against self-incrimination, right to privacy, and equal protection; (3) the court abused its discretion in finding that the identification technician was qualified to testify as a fingerprint expert; (4) the photographic identification procedure was impermissibly suggestive and was also improperly conducted in that he was not represented by counsel at the time the pretrial identification was made; (5) the court erred in its evidentiary rulings; (6) the district attorney was guilty of prejudicial misconduct in his closing argument to the jury; and (7) the court erred in its instructions to the jury.

Defendant initially maintains that it was error for one judge to preside over the *voir dire* proceedings and for another judge to preside over the trial. When the case was called for trial before Judge Marsh on July 22, 1969, he apparently was engaged in another matter. The district attorney and defense counsel stipulated that Judge Slaughter could preside over the *voir dire* examination of the jury, and that when the jury had been impaneled, the matter could be reassigned to Judge Marsh for purposes of trial. After the jury was selected and sworn, Judge Marsh presided over the case from the commencement of testimony to and including the pronouncement of judgment.

The defendant now maintains that he never personally consented to the foregoing procedure, citing *In re Tahl,* 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], and *Boykin* v. *Alabama,* 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709], as authority for the proposition that his personal consent was required. *Tahl* and *Boykin* are inapposite inasmuch as they involve the rendition of a guilty plea, not trial procedure. *People* v. *Eckert,* 16 Cal. 110, relied upon by the defendant in support of his contention that it is error for one judge to preside over part of the trial and another judge to preside over the remaining portion of the trial is likewise not in point inasmuch as *Eckert* involved a situation where the substitute judge was called in at the very close of the trial, whereas here, Judge Marsh assumed his role as trial judge before any evidence had been presented. Under section 1053 of the Penal Code, it is provided that if, after the commencement of a criminal trial, the judge presiding ". . . shall die, become ill, or for any other reason be unable to proceed with the trial. . . ." any other judge of the same court may proceed with the trial. Moreover, any objection to the procedure employed at the defendant's trial was waived by reason of the stipulation of defense counsel. (See *People* v. *Henderson,* 28 Cal. 465, 473.)

Defendant next asserts that article 294 of division 2 of the Palm Springs Ordinance Code, providing for the registration of bartenders is unconstitutional; that inasmuch as his arrest resulted from being fingerprinted under an invalid ordinance, the arrest was illegal, and the evidence obtained under the ordinance should have been suppressed.

The Palm Springs ordinance requiring the registration of certain classifications of employees reads as follows: "INTENT AND PURPOSE. The provisions of this Article intend to cover temporary and itinerant classes of employees and the purpose for the regulations hereunder is to protect the visitors and residents of this resort community from crime and loss both against the person and against property. Because of the nature and

structure of this City, law enforcement must be given the tools to combat the increased crime threat growing out of an ever changing population complex. It is not the intent of this Ordinance to invade the privacy or individual rights of employees within the City beyond what is necessary to preserve the health, safety and general welfare of the City's inhabitants and visitors. . . .

"EMPLOYEE. In this Article 'employee' shall mean any person employed for the following purposes, including any self-employed person, pursuing his employment in or about the premises hereinafter referred to and with the consent of the management: hotel, apartment house, nightclub or restaurant employees, domestic help or gardeners, gasoline service station employees, car wash employees, golf caddies, bus drivers, taxi-cab drivers, on-sale bartenders, off-sale liquor store employees and employees of stores selling alcoholic beverages wherein the said sale of alcoholic beverages is not the sole activity of the establishment, control service employees, pool maintenance employees, drug store or drug department employees, horse stable and riding academy employees, massage employees, reducing salon employees, operators and employees of bridge clubs, operators and employees of dance studios, night watchmen and caretakers and building maintenance employees. . . .

". . . . . . . . . . . . . . . . .

"REGISTRATION WITH THE POLICE CHIEF. Every employee, as herein defined, and included, shall, within forty-eight (48) hours after the commencement of his duties of employment, register with the Chief of Police of the City of Palm Springs. . . .

"DUTY TO TAKE, DISTRIBUTE FINGERPRINTS. The Chief of Police, pursuant to Section 2943, shall fingerprint each employee covered hereunder and forward one set of fingerprint cards to the Bureau of Criminal Identification and Investigation of the State of California, and one set of fingerprint cards to the Federal Bureau of Investigation. . . .

"OTHER REQUIRED INFORMATION. The Chief of Police shall further ascertain and record the following information: name, age, local residence, permanent residence, personal description, nearest relative or friend and the address of same, and the last place of employment. . . .

". . . . . . . . . . . . . . . .

"CARRYING OF REGISTRATION CARD. The registration card issued pursuant to Section 2946 shall be carried on the person of the registrant at all times during the period of the validity of the said registration card or during employment with the City of Palm Springs, whichever time be the shorter.

Any employee knowingly and wilfully refusing to register, as required here under, may be taken into custody by the Police Department of the City of Palm Springs for the period of time necessary to accomplish such registration. No registration card issued to an employee shall be valid after five (5) years from the date of issuance; and the said employee shall re-register with the Chief of Police as hereinafter provided, at the time of expiration of the validity of the registration card, provided the said employee remains employed within the City of Palm Springs. . . .

" . . . . . . . . . . . . . . . ."

It appears from the record that the defendant became a suspect in both assault cases prior to January 28, 1969, inasmuch as he was questioned by a Palm Springs police officer on that date and informed that he fit the description of the attacker. On January 29, the defendant voluntarily registered at the police station pursuant to the aforesaid ordinance. Prior to the defendant's visit to the police station, an employee of the Holiday Inn had called and told the police that the defendant was coming in. The ordinary job application form prepared in conformity with the ordinance requested that the registrants "print" the information on the form. The form to be filled in by the defendant was altered to require that defendant "write" the necessary information. The defendant wrote out the information required by the ordinance and executed a fingerprint card. On January 30 the defendant was placed under arrest after the two prints found on the glass from which the assailant had drunk at the scene of the rape offense were found to match the defendant's.[2]

In attacking the constitutionality of the Palm Springs ordinance, defendant asserts that his Fifth Amendment privilege against self-incrimination has been violated. Several registration statutes have been struck down as violative of the Fifth Amendment where the registration requirement could result in the prosecution of the registrant (*Haynes* v. *United States,* 390 U.S. 85 [19 L.Ed.2d 923, 88 S.Ct. 722] (registration of persons owning firearms); *Marchetti* v. *United States,* 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697] (federal wagering tax law); *Leary* v. *United States,* 395 U.S. 6 [23 L.Ed.2d 57, 89 S.Ct. 1532] (marijuana tax act); *People* v. *McCormick,* 102 Cal.App.2d Supp. 954 [228 P.2d 349] [registration by members of the Communist Party].) The rationale of these cases is that the registration statutes are directed principally at those persons apparently suspect of criminal activities whose registration would tend to facilitate their prosecu-

---

[2]While the writing on the note found in the vacant lot also matched the defendant's writing on the job application form, such fact was not known to the arresting officers prior to defendant's arrest.

tion (*Haynes* v. *United States, supra,* 390 U.S. 85, 96-97 [19 L.Ed.2d 923, 932-933]), inasmuch as the information which the registrants were required to give provided a significant link in a chain of evidence tending to establish their guilt. (*Marchetti* v. *United States, supra,* 390 U.S. 39, 48 [19 L.Ed.2d 889, 897].) In *United States* v. *Lookretis,* 398 F.2d 64, evidence obtained from compliance with the wagering tax law struck down in *Marchetti* was deemed inadmissible in a prosecution for using a facility of interstate commerce to carry on illegal gambling activity. Consequently, defendant has standing to raise the issue.

In the case at bar, however, the supplemental information written by defendant on the job application form required by the ordinance was in no manner incriminating. The giving of his name, age, residence, physical description, and last place of employment are the types and kinds of information commonly required by any prospective employer and did not furnish incriminating information relative to the criminal offenses under review, nor was such information used against him in such prosecution.

■ The taking of identifying physical characteristics such as fingerprints or handwriting exemplars are outside the constitutional protection of the Fifth Amendment. (*Gilbert* v. *State of California,* 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951]; *Lewis* v. *United States,* 382 F.2d 817, 818-819 [127 App.D.C. 269]; *Wesley* v. *United States,* 384 F.2d 100, 101.)

■ Defendant correctly asserts that where fingerprints are obtained in violation of constitutional rights, such as where they are secured as a result of an unlawful arrest or detention, the fingerprint evidence is inadmissible because it has been obtained in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. (*Davis* v. *Mississippi,* 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394] see also *Bynum* v. *United States,* 262 F.2d 465 [104 App.D.C. 368].) However, a crucial distinction is noted between *Davis* and the instant case; in *Davis,* the defendant was arrested without probable cause; his fingerprints were therefore illegally obtained as a result of such arrest. In the case under review, there was neither arrest nor detention; instead, defendant voluntarily appeared at the police station to comply with the ordinance in order to obtain employment.[3]

Therefore, defendant's contention based on illegal search and seizure and violation of the right of privacy are to be determined by the constitutionality of the ordinance.

---

[3]Consequently, we need not, and do not, decide any constitutional issue which might arise in the event any of the enumerated employees designated in the Palm Springs ordinance knowingly and willfully refuse to register and ". . . be taken into custody by the Police Department . . . ." as required under the last quoted section of the ordinance.

In *Thom* v. *New York Stock Exchange,* 306 F.Supp. 1002, substantially the same arguments being adduced herein were considered and rejected by the reviewing court; in *Thom,* the state of New York, in response to rising thefts in the securities industry, enacted a statute which required all employees of member firms of national security exchanges registered with the Securities and Exchange Commission to be fingerprinted as a condition of employment; the employees affected by the statute attempted to enjoin enforcement of the act, claiming, among other things, that the fingerprinting requirement constituted an illegal search and seizure and was violative of their right of privacy; the court disagreed, stating that fingerprinting in a non-criminal context was widespread, that there was no significant intrusion on the privacy of the registrants, and that the registration act represented a valid exercise of the state's police power.

In California there are many non-criminal situations in which fingerprints are required of a registrant or applicant for a license. (See Bus. & Prof. Code, §§ 6876, 6894.4, 6894.13 (collection agencies and their employees); and § 7525 (private detectives); Civ. Code, § 607f (humane officers); Gov. Code, § 1030 (peace officers); Ins. Code, § 1652 (insurance agents, brokers, and solicitors); Pen. Code, § 12052 (applicants for a license to carry a concealed weapon).) In *Davis, supra,* the court conceded that in non-criminal situations a statute could require fingerprinting of certain persons, if narrowly circumscribed by appropriate standards to protect privacy. (*Davis* v. *Mississippi, supra,* 394 U.S. 721, 727 [22 L.Ed.2d 676, 681].)

We have concluded that the ordinance in question is a valid exercise of the municipality's police power. Its stated purpose is to protect visitors and residents of the resort community from the increasing crime threat posed by occupational categories where there are a substantial number of itinerant employees. Because tourism is seasonal, there is an obvious necessity for short-term, non-permanent employees during the busy season. The problem of shifting personnel and mounting crime in an industry is a legitimate governmental interest. (*Thom* v. *New York Stock Exchange, supra,* 306 F.Supp. 1002, 1006.)

Defendant's claim that the act violated his right of privacy (see *Griswold* v. *Connecticut,* 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678]) is likewise not persuasive. The information obtained by compliance with the ordinance (name, age, residence, physical description) is of a type readily ascertainable. It also appears that the police herein had already derived all the information required by the ordinance prior to registration, with the

possible exception of the defendant's last place of employment. Consequently, it is difficult to comprehend, let alone sustain, defendant's assertion.

■ The defendant's contention that the ordinance constitutes an invidious discrimination against the enumerated classifications in that only certain job applicants are required to register while persons in other occupational fields are not required to register lacks integrity. The extension of the registration to other occupational categories is a matter of legislative judgment and discretion; if the law presumably hits evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied. (*Thom* v. *New York Stock Exchange, supra,* 306 F.Supp. 1002, 1012.)

■ Defendant argues that the ordinance places an unconstitutional condition on his "right of employment," relying on such cases as *Garrity* v. *State of New Jersey,* 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616]; *Uniformed Sanitation Men Assn.* v. *Commissioner of Sanitation,* 392 U.S. 280 [20 L.Ed.2d 1089, 88 S.Ct. 1917].) In those cases, the issue was whether an individual could be forced to choose between his job and his privilege against self-incrimination, and the court properly ruled that the state could not impose burdens on the exercise of those rights. Here, defendant enjoyed no Fifth Amendment privilege so his fingerprints and handwriting exemplar were validly secured. The enactment of the ordinance constituted a valid exercise of police power. Moreover, the information required by the Palm Springs statute is not *per se* incriminating.

In his final attack on the ordinance, defendant suggests that defendant's Fourth Amendment rights have been violated by ruse or trickery, and that evidence gathered by devious police practices should be excluded. Defendant attempts to bring himself within the scope of *Graves* v. *Beto,* 424 F.2d 524. In the cited case, the police had arrested the defendant on a charge of public drunkenness; shortly after his arrest, they received a report of a rape, and defendant matched the assailant's description; some blood had been found on the victim's bed covers; the police requested permission to take a sample of blood; initially, defendant refused permission but consented when he was informed that it would be used to determine the alcoholic content; the reviewing court held that there was no emergency and a warrant could have been obtained; the evidence secured by strategem was inadmissible because a warrant was required. While in *Graves, supra,* there was an active misrepresentation to secure defendant's consent, in the case at bar defendant does not suggest that the police set up his employment interview; he can point to no misrepresentation. Obviously, he knew he was a suspect; nevertheless, he complied with the ordinance. As discussed above, so long as the

ordinance is not unconstitutional, the fingerprints were constitutionally obtained and, as such, no restrictions are placed on their subsequent use.

Although the Palm Springs registration form was changed to read "write" instead of "print," so the police could obtain a handwriting exemplar, the act of the police in altering the form does not rise to the level of constitutional magnitude. The exemplar was not used as evidence in support of probable cause to arrest; in actuality, it was not examined by the expert until March 18. By that time the police could have required a handwriting exemplar.

The defendant's contention that the fingerprint identification technician did not qualify as an expert is untenable. The technician involved herein had testified as a fingerprint expert in three prior felony cases, had received his training from the FBI, and had made over 10,000 comparisons of fingerprints for identification or classification purposes. While he did not have a university degree, such degree is not indispensable to expertise. (*People* v. *Smith,* 142 Cal.App.2d 287, 293 [298 P.2d 540].) It is the function of a trial court to determine the qualifications of an expert, and the degree of his knowledge is a matter which affects the weight of his testimony, not its admissibility. (See *People* v. *Allen,* 254 Cal.App.2d 597, 604 [62 Cal.Rptr. 235].) The trial court's determination that the technician was an expert will not be disturbed. (*People* v. *Murray,* 247 Cal.App.2d 730, 735 [56 Cal.Rptr. 21].)

Defendant next maintains that the photographic identification procedure was impermissibly suggestive and that he should have had appointed counsel during the pretrial photo process. In the absence of unfairness, the employment of photographs as an investigative tool is an approved procedure. (*Simmons* v. *United States,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967].) The rule that an accused is entitled to be represented by counsel at a pretrial lineup identification (*United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Gilbert* v. *State of California, supra,* 388 U.S. 263) does not ordinarily apply to a pretrial identification by photograph. (*People* v. *Adair,* 2 Cal.App.3d 92, 97 [82 Cal.Rptr. 460].) Basic to the decisions in *Wade* and *Gilbert* is the conclusion that a lineup identification affords suggestive influences prejudicial to the accused not readily detectible by him, and the presence of counsel is necessary to enable reconstruction of those influences at trial to assure a fair determination of the reliability of the identification. (*United States* v. *Wade, supra,* 388 U.S. 218, 229-230 [18 L.Ed.2d 1149, 1158-1159].) Any suggestive influences present at a photo-identification in large measure are preserved by the photographic evidence or readily detectible by cross-examination of the participants. (*Simmons* v. *United States,*

*supra,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253].) ▉▉▉ The need to obtain identification of a suspect by photograph, whether or not he is in custody, as a police practice in the detection of crime outweighs the need for presence of counsel representing the suspect during such identification. (*People* v. *Hawkins,* 7 Cal.App.3d 117, 122 [86 Cal.Rptr. 428].) Consequently, there was no need for defense counsel to be present at the photographic identification procedure. Furthermore, there is no evidence that the photo-identification process was unfair or in any manner deprived the defendant of due process. The rape victim was shown 100 photographs, and the record reflects that the photographs presented to her tended to match her description of the assailant as to age, size and build. ▉▉▉ Moreover, no objection was made by defendant's trial counsel to the pretrial identification procedure; under the circumstances, defendant may not contend on appeal that the procedure was unfair. (*People* v. *Adair, supra,* 2 Cal.App.3d 92, 94-95.)

Furthermore, the record reflects that the in-court identification of the defendant by the two victims was not based on the photographs but on their observations at the time of the attacks. (*People* v. *Brown,* 273 Cal.App.2d 109, 112 [77 Cal.Rptr. 863].)

▉▉▉ Defendant charges that the court erred in its rulings on the admissibility of evidence. First, he states that his counsel's right of cross-examination of the prosecutrix in the rape case was unduly restricted. However, the allegation is unsupported by the record. Counsel for the defendant extensively cross-examined the prosecutrix, covering approximately 170 pages of transcript. The court at one point commented that ". . . [I]t is my duty to control the courtroom . . . [I]f [the prosecutrix] is not telling the truth, demonstrate that. On the other hand, if she is telling the truth, it is my duty not to let witnesses be unnecessarily impeached . . . ." This comment was occasioned by defense counsel's technique of extensively employing the transcript of a prior examination of the witness and going through it sentence by sentence. After the comment by the court, quoted above, defense counsel proceeded on in the same manner. ▉▉▉ Control of cross-examination is within the discretion of the trial court, and only a manifest abuse of discretion will warrant a reversal. (*People* v. *Swayze,* 220 Cal.App.2d 476, 505 [34 Cal.Rptr. 5].) There has been no abuse of discretion. The court simply acquainted counsel with the fact that he was required to show specific contradictions in order for there to be proper impeachment.

▉▉▉ Defendant next contends that the defense's motion to strike the fingerprint expert's testimony was erroneously denied. The fingerprint expert was asked the following question pertaining to the drinking glass found

in the rape victim's apartment: "Q. You don't know if anyone put it there at some time after you got in the apartment, do you? "A. No, with an explanation. I don't know that they didn't, but I certainly don't believe they did considering the time I was in the kitchen and the living room area." Defense counsel moved to strike the answer on the ground that the answer was not responsive and conjectural. As counsel on appeal concedes, the proper objection would have been that the answer was conclusionary. Inasmuch as defense counsel did not make the proper objection, defendant may not raise the objection on appeal. (See Evid. Code, § 353.)

Defendant also maintains the court precluded his counsel from inquiring whether the fingerprint expert had attempted to "classify" defendant's fingerprints or the fingerprints lifted from the glass. However, the record indicates that defense counsel cross-examined the expert extensively regarding the prints lifted from the glass, and that the expert's testimony on direct examination involved the comparison of prints rather than their classification. Under the circumstances, no error resulted.

Defendant next contends that the court erroneously refused to admit certain debris and a handwriting exemplar of the 14-year-old sex perversion victim into evidence. However, defense counsel does not indicate how the exclusion of such evidence in any way prejudiced the defense nor in what manner the proffered evidence was material to the defense. Consequently, the allegation need not be considered.

Defendant's final evidentiary argument is that the court erred in refusing to permit defense counsel to conduct an experiment before the jury. The determination whether conditions for the experiment were sufficiently similar to make the experiment of any value in aiding the jury was a matter in the sound discretion of the trial court. (*People* v. *Roberts,* 40 Cal.2d 483, 491 [254 P.2d 501].) No abuse of discretion has been shown.

Defendant maintains that the district attorney was guilty of prejudicial misconduct in his closing argument to the jury. In his final argument, defense counsel suggested that the 14-year-old sex victim had had improper sexual experiences with her natural father and that she was untruthful. He also argued that the rape victim had voluntarily submitted to intercourse, had falsified the report of being raped, and was more unchaste than she testified.

The purpose of the above arguments was to persuade the jury that the complaints were false. The effect was to disparage the character of the victims. In addition, defense counsel indicated several times that he felt his

client was a scapegoat, stating at one point, "I don't care if he [the deputy district attorney] says he represents the People, he is not here just for the People, he is here to convict the defendant . . . He is not an impartial protagonist, he is a biased protagonist of these matters."

In reply, the deputy district attorney denied the allegation that the case was a "frame" and stated: "The Deputy District Attorneys of this County act not only as officers of the court, but as a quasi-judicial officer, he reviews the cases and takes those to trial that are worthy of prosecution." At this point, defense counsel objected to the argument as improper. The objection was sustained. There was no request for an admonition, and none was given.

The district attorney's remarks do not create the impression that he had personal knowledge of the defendant's guilt or that he would not have pursued the prosecution unless he believed the defendant to be guilty. (See *People* v. *Kirkes*, 39 Cal.2d 719, 723 [249 P.2d 1]; see also *People* v. *Hidalgo*, 78 Cal.App.2d 926, 939 [179 P.2d 102].) Instead, the remarks could be construed as asserting a belief that the evidence was credible and not fabricated. (See *People* v. *Johnson*, 99 Cal.App.2d 717, 728-729 [222 P.2d 335].) Nevertheless, the court sustained the objection but defense counsel did not request an admonition. ▮ Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial, unless the case is extremely close and the remarks contributed materially to the verdict, or unless the harmful aspect of the remarks could not have been obviated by an admonition. (*People* v. *Ney*, 238 Cal.App.2d 785, 790 [48 Cal.Rptr. 265].) This case presents neither of those circumstances, and assigning misconduct or requesting an admonition would have removed any impact the argument would have had on the jury. (See *People* v. *Lyons*, 50 Cal.2d 245, 261-263 [324 P.2d 556].)

Finally, defendant complains that several instructions were erroneous. Defendant first claims that the assault instructions (felony assault and simple assault) were confusing in that only one stated that specific intent was required and that the instructions governing assault were therefore incomplete. However, the court did instruct on the doctrine of specific intent in connection with felony assault, and the instruction was proper. (See *People* v. *Wilson*, 66 Cal.2d 749, 765 [59 Cal.Rptr. 156, 427 P.2d 820].)

▮ Defendant next contends that he was prejudiced by an instruction which referred to the offense set forth in section 288 of the Penal Code as "oral sex perversion" because the conduct characterized therein may not

be classified as perverted. Defendant's contention is more philosophical than legal. He was charged in count II of the amended information with oral copulation by force. The crime of oral copulation is commonly recognized and referred to as a type of sex perversion. (See *People* v. *Washington,* 203 Cal.App.2d 609, 610 [21 Cal.Rptr. 788]; *People* v. *Ragen,* 262 Cal.App.2d 392, 396 [68 Cal.Rptr. 700].)

▆ Defendant next maintains that the court should not have defined the crime of rape in two separate instructions. The court defined rape in both a form instruction (CALJIC 505) and also in statutory terms. (Pen. Code, § 261, subd. 3.) Both instructions are identical and properly defined the elements of the offense. No possible harm resulted from the repetition.

▆ Defendant next maintains that the instruction defining section 288 of the Penal Code improperly referred to it as a felony when in actuality it is an alternative sentence offense. The instruction was proper. Section 17 of the Penal Code provides that a felony is a crime which is punishable by death or imprisonment in the state prison, and that in the case of a crime punishable by an alternate sentence, defendant may be fined or sentenced to county jail, in which case the offense is a misdemeanor rather than a felony. Defendant was charged with oral copulation by use of force or by threat of great bodily harm and the offense, as charged, is a felony. (See Pen. Code, § 288a.)

Defendant contends it was reversible error to read the second paragraph of the following instruction (CALJIC 501 (Rev.) as modified): "[C]harges such as those made against the defendant in this case, . . . generally speaking, are easily made, and once made, difficult to disprove. From the nature of a case such as this, the complaining witness and the defendant usually are the only witnesses. Therefore, I charge you that the law requires that you examine the testimony of the prosecuting witnesses with caution.

"However, the fact that the charge here made is one difficult to disprove should not deter you from rendering a verdict of guilty, if you are convinced beyond a reasonable doubt that the defendant is guilty as charged."

The questioned paragraph has been consistently approved as an accurate statement of the law, not opposing or neutralizing the first portion of the instruction, and not indicating an opinion of the court as to guilt or innocence. (*People* v. *Westek,* 31 Cal.2d 469, 483 [190 P.2d 9]; *People* v. *Ragen, supra,* 262 Cal.App.2d 392, 402; *People* v. *Scarborough,* 171 Cal. App.2d 186, 194 [340 P.2d 76]; *People* v. *Ernst,* 121 Cal.App.2d 287, 295-296 [263 P.2d 114]; *People* v. *Ahsbahs,* 77 Cal.App.2d 244, 251

[175 P.2d 33]; *People* v. *Arechiga,* 72 Cal.App.2d 238, 240 [164 P.2d 503].)

However, in one case the rendition of the paragraph was held to be reversible error. In *People* v. *Lyons,* 47 Cal.2d 311, 323 [303 P.2d 329], upon which defendant relies, the court found it to be prejudicial because it was "wholly unnecessary to a fair and clear statement of the pertinent proposition of law and . . . [was] supererogated in the handwriting of the judge on the already adequate printed instruction which was taken into the jury room . . . ." The reviewing court felt that the jury would have noted that the statement was in the judge's handwriting and drawn from it an implication that the judge was expressing his opinion as to defendant's guilt.

Defendant also cites *People* v. *Hurlburt,* 166 Cal.App.2d 334 [333 P.2d 82, 75 A.L.R.2d 500], a child molestation case in which the only issue on appeal was whether the court erred in restricting defense cross-examination of the child for the purpose of showing that prior identical accusations made by the child were false. The statement in the opinion that a giving of the second paragraph of the instruction in question would be reversible error (citing *People* v. *Lyons, supra,* 47 Cal.2d 311) was *dictum.* The statement was made in the course of the court's general observations that considerable latitude in cross-examination must be permitted because courts have long recognized that a sex charge, particularly involving a child, is easily made but difficult to disprove.

Cases since *Lyons* have held that the rendition of the second paragraph of CALJIC 510 (Rev.), where it is not overemphasized, is proper. (*People* v. *Ragen, supra,* 262 Cal.App.2d 392, 402; *People* v. *Scarborough, supra,* 171 Cal.App.2d 186, 194.) In the present case defendant does not suggest, nor does the record indicate, that the judge in any manner placed any undue emphasis on the second paragraph of the instruction.

 Defendant charges that the jury was not instructed that it could return a verdict of not guilty as to count II (oral copulation) because of a mistaken alteration of the instruction. While the jury was properly instructed as to the possible verdicts as to count I, by inadvertence, a "not guilty" verdict form was not included as to count II. However, the jury was given the following form which inadvertently referred to count I instead of count II: "As to Count I, We, the jury in the above entitled action, find the defendant . . . not guilty of violation of Section 288a of the Penal Code of the State of California (oral sex perversion), a felony, as charged in Count II of the Information." Obviously, the defendant could not have

been prejudiced by the giving of the foregoing instruction. While the preamble to the instruction indicates it relates to count I, the body of the instruction reflects that it relates to the crime of oral copulation charged in count II, so no possible prejudice resulted from the inadvertent reference to count I.

■ Defendant finally maintains that the court erred in giving the instructions dealing with the presumption of innocence and proof beyond a reasonable doubt (CALJIC 21 and 22) on the basis that the instructions are confusing. (See 43 State Bar J. 546, 551.) However, CALJIC 21 merely paraphrases section 1096 of the Penal Code and is proper. (See *People* v. *Morris,* 260 Cal.App.2d 848, 849-850 [67 Cal.Rptr. 566].) Moreover, defendant waived any objection to the instructions by his failure to object. (See *People* v. *Burrows,* 260 Cal.App.2d 228, 230 [67 Cal.Rptr. 28].)

The judgment of conviction is affirmed.

Tamura, Acting P. J., and Gabbert, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 9, 1970.