[Civ. No. 54345. First Dist., Div. Four. May 26, 1983.]

MURRAY MILLER et al., Plaintiffs and Appellants, v.
CORNELIUS P. MURPHY, as Chief of Police, etc., et al.,
Defendants and Respondents.

338

COUNSEL

Joseph D. O'Sullivan for Plaintiffs and Appellants.

George Agnost, City Attorney, and Paula Jesson, Deputy City Attorney, for Defendants and Respondents.

OPINION

**CALDECOTT, P. J.**—The basic issue presented by this appeal involves the constitutionality of pawnbroker regulations adopted by the City and County of San Francisco.

Appellants are several licensed pawnbrokers operating pawnshops in San Francisco. Respondents are the San Francisco Chief of Police and the San Francisco Police Commission. Appellants filed a petition for writ of mandamus, and a complaint for declaratory and injunctive relief against respondents challenging the constitutionality of pawnbroker regulations established by respondents under authority of section 2815 of article 28 of the San Francisco Municipal Police Code. Following trial, judgment was entered denying petitioners relief in all respects. The appeal is from the judgment.

Under Business and Professions Code section 21628, pawnshop operators throughout the state are required to keep a report of every transaction they make. These reports, or transaction slips, must include the name and address of the customer, a description of the property to be pawned, and a certification by the operator that the information is correct. The San Francisco pawnbroker regulations (hereafter regulations), however, add to those requirements. First they provide that the only acceptable identification for a pawnshop transaction is a valid driver's license, an identification card issued by a government agency "which contains a photograph or complete physical description of the issuee." A social security card is acceptable only if the pawnshop operator personally knows the customer. The regulations further require that the pawnbroker obtain an impression of the customer's fingerprint on the transaction slip. Additionally, the regulations require that the pawnbroker post, on his premises, his interest rates charged in letters at least two inches in height. Finally, the regulations provide that pawnbrokers who violate the regulations may be subject to revocation or suspension of their permit.

I

Appellants contend that the Legislature, by enacting laws governing pawnshops, has preempted any local legislation in that area. Accordingly, appellants

argue, since the regulations are inconsistent with Business and Professions Code, chapter 9, article 4 (§ 21625 et seq.; hereafter Article 4), they are invalid. However, an examination of Article 4, in conjunction with the regulations, reveals that the Legislature has not completely taken over the area of pawnshop operators, and that in any event the regulations are not inconsistent with Article 4.

The law of preemption is discussed in detail in *Stewart* v. *County of San Mateo* (1966) 246 Cal.App.2d 273 [54 Cal.Rptr. 599]. ■ When local legislation adds requirements to an area which has been preempted by the Legislature, that local legislation is invalid. (*Id.*, at p. 281.) To determine whether the Legislature has preempted a certain field, one must question whether the Legislature "intended to occupy a particular field to the exclusion of all local regulation." (*Id.*, at p. 282.) This intent is determined by "an analysis of the state legislation in terms of its language, purpose, and scope, and the facts and circumstances upon which it was intended to operate." (*Id.*) Where the intent of the Legislature is to have exclusive control in an area, local authorities may not legislate in the same area. Conversely, when there seems to be no intent to have exclusive control, local authorities may add supplementary regulations. (*Id.*)

■ Application of the above standards to this case reveals that the regulations do not invade the area which the Legislature has intended to exclusively control. Article 4, section 21625 of the Business and Professions Code, provides that the statewide provisions were enacted to require uniform statewide reporting of pawnshop transactions in order to control and discover "the dissemination of stolen property." Furthermore, the Legislature intended that the provisions "shall not be superseded or supplanted" by local ordinances. (*Id.*) This might be indicative of an intent to possess exclusive legislative authority in the pawnshop area, but examination of other provisions reveals otherwise.

First, section 21638 provides that local ordinances "not inconsistent" with article 4 are valid. Second, section 21628 provides that a report be made of each transaction the pawnbroker makes, and that each report "shall include, but not be limited to," the name and address of the customer, a description of the property, and a certification by the operator concerning the accuracy of the information. Thus, the Legislature, by the words, "but not be limited to," indicated that it only meant to set forth the minimum requirements for the daily report. It extended an invitation to local governments to add to the information required on the reports, as long as the minimal requirements of section 21628 were followed.

Paragraph III, section 5 of the regulations provides that a customer's identification must consist of a valid driver's license, a California Department of

Motor Vehicles identification card, or other governmental identification with a photograph and a "complete physical description of the issuee." This is not inconsistent with section 21638, as it merely provides for the manner in which the customer proves his name and address that is entered on the required report. Section 5(e) requires that the report contain a fingerprint of the customer. This is, again, merely an additional requirement beyond the minimum information which the Legislature requires.

In summary, local governments are free to add requirements, so long as they do not counter legislative intent to aid in the prevention of thefts and the recovery of stolen property. The San Francisco regulations merely add to those minimum requirements as a means to further aid the detection of crimes of theft, and cannot be said to have surpassed local authority to regulate.

## II

Appellants allege that the regulations violate several constitutional protections, including the right to privacy, the freedom of occupation and contract, and equal protection. In what follows, each of those alleged violations will be considered separately.

### Judicial Review of Legislation

■ In order to determine the constitutionality of a legislative regulation, courts initially consider the nature of the interest. Depending upon the quality of that interest, one of several standards of review may be used in analyzing the restriction. When "'fundamental rights'" are involved, the "regulation limiting [those] rights may be justified only by a 'compelling state interest.'" (*Roe* v. *Wade* (1973) 410 U.S. 113, 155 [35 L.Ed.2d 147, 178, 93 S.Ct. 705]; see also: *Kramer* v. *Union School District* (1969) 395 U.S. 621, 627 [23 L.Ed.2d 583, 589, 89 S.Ct. 1886]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.Ed.2d 600, 614, 89 S.Ct. 1322]; *United States* v. *Karnes* (9th Cir. 1971) 437 F.2d 284, 287; *City of Carmel-By-The Sea* v. *Young* (1970) 2 Cal.3d 259, 269 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) When regulated interests do not rise to a "fundamental" level, however, the regulation is not subjected to such strict review. In that case courts most often use what is termed as the "traditional standard," determining whether a regulation has a reasonable or rational basis. (*United States* v. *Mara* (1973) 410 U.S. 19, 22 [35 L.Ed.2d 99, 103, 93 S.Ct. 774]; *United States* v. *Karnes, supra,* 437 F.2d 284, 288; *Keker* v. *Procunier* (E.D.Cal. 1975) 398 F.Supp. 756, 762.) Both the traditional standard and the strict scrutiny standard necessitate a balancing of governmental interests on one hand, against the restrictions of constitutional rights on the other. (*City of Carmel-By-The Sea, supra,* 2 Cal.3d 259, 269; *Plante* v. *Gonzalez* (5th Cir. 1978) 575 F.2d 1119, 1132-1134.) However, the

two tests do differ in important ways. With strict scrutiny analysis, " '[t]he law must be shown "necessary, and not merely rationally related to, the accomplishment of a permissible" ' " and compelling interest. (*Carmel-By-The-Sea, supra,* 2 Cal.3d 259, 268, citing *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 497 [14 L.Ed.2d 510, 522, 85 S.Ct. 1678].) However, when the traditional standard is implemented, the balancing favors the constitutionality of the statute. The regulation at issue will be invalidated only if it is "clearly unfounded." (*United States* v. *Karnes, supra,* 437 F.2d 284, 288.) There is, in essence, a presumption that the statute is constitutional. (*Cooper* v. *County of Los Angeles* (1975) 49 Cal.App.3d 34, 41 [122 Cal.Rptr. 464, 76 A.L.R.3d 1210]; *Bowker* v. *Baker* (1946) 73 Cal.App.2d 653, 657 [167 P.2d 256].)

### *The Right to Privacy*

■ The right to privacy protects a person's interest in being free from governmental invasions "of the sanctity of a man's home and the privacies of life." (*Boyd* v. *United States* (1886) 116 U.S. 616, 630 [29 L.Ed. 746, 751, 6 S.Ct. 524].) Even more simply, it may be referred to as the "right to be let alone." (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193.) The California Constitution specifically secures the right of privacy. (Cal. Const., art. I, § 1.) Meanwhile, the United States Supreme Court has held that the right to privacy is one of those rights which necessarily emanates from other specifically guaranteed rights of the United States Constitution. (*Griswold* v. *Connecticut, supra,* 381 U.S. 479, 484-485 [14 L.Ed.2d 510, 514-515].)

Appellants have separated their claim concerning privacy into two parts. The first is that the ordinance constitutes unauthorized "government snooping," and the second is that the ordinance constitutes an "overbroad collection and retention of unnecessary personal information." (*White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222].) However, it is not necessary to discuss appellants' privacy rights with those distinctions in mind. They both concern the general right to privacy, and appellants' rights may be discussed in a general fashion as well. As will be made more clear in the following, what is important are the various rights and interests involved, not the specific ways in which appellants' privacy rights have been implicated.

In limited instances, the right to privacy has been declared to be a fundamental right and therefore worthy of strict scrutiny. (*Roe* v. *Wade, supra,* 410 U.S. 113, at pp. 154-156 [35 L.Ed.2d 147, at pp. 177-179] [right to decide whether to abort pregnancy]; *Griswold, supra,* 381 U.S. 479, 486-487 [14 L.Ed.2d 510, 516-517] [right to privacy in the marriage relation].) However, *Roe* v. *Wade* and *Griswold* do not stand for the proposition that all regulations in some way connected with privacy necessarily implicate a fundamental right. Some constitutional restrictions, even though identified with the right to privacy, are

deserving of less than strict scrutiny because of their minimal intrusion into a person's privacy. Restrictions of privacy caused by fingerprinting are one of those areas in which courts have not extended the protection of strict scrutiny.

The starting point in discussing the constitutionality of fingerprinting requirements is *Davis* v. *Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394]. At issue in that case was the constitutionality of the actions of police officers who had indiscriminately detained, without probable cause, 24 youths for questioning and fingerprinting in connection with a rape investigation. Basing its analysis upon the Fourth Amendment the court held the detentions to be unconstitutional, as there was no probable cause and the suspect was "not merely fingerprinted . . . but also subjected to interrogation." (*Id.,* at p. 728 [22 L.Ed.2d at p. 681].) However, the court also directly discussed the constitutionality of compelled fingerprinting itself: "Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. Nor can fingerprint detention be employed repeatedly to harass any individual, since the police need only one set of each person's prints. Furthermore, fingerprinting is an inherently more reliable and effective crime-solving tool than eyewitness identifications or confessions and is not subject to such abuses as the improper line-up and the 'third degree.' Finally, because there is no danger of destruction of fingerprints, the limited detention need not come unexpectedly or at an inconvenient time." (*Id.,* at p. 727 [22 L.Ed.2d at p. 681].) Thus, the United States Supreme Court recognized that restrictions on privacy caused by fingerprinting requirements may not be worthy of a preferred position among the fundamental constitutional protections.

That fingerprinting requirements may not be subjected to strict review has been consistently adhered to by the United States Supreme Court. The usual justification has been that the print of a person's finger is a personal characteristic which is continually and knowingly offered to public inspection. Seizures of reflections of other personal characteristics, such as the nature of one's handwriting or voice, have been upheld on similar grounds. (*United States* v. *Dionisio* (1973) 410 U.S. 1, 14 [35 L.Ed.2d 67, 79, 93 S.Ct. 764]; *United States* v. *Mara, supra,* 410 U.S. 19, 21-22 [35 L.Ed.2d 99, 102-103]; see also: *Cupp* v. *Murphy* (1973) 412 U.S. 291 [36 L.Ed.2d 90, 93 S.Ct. 2000].)

State and federal courts throughout the nation have taken up the rationale of the United States Supreme Court's holding concerned with fingerprinting, and accordingly have consistently held that full scrutiny is not required. A review of those cases follows.

In *Thom* v. *New York Stock Exchange* (S.D.N.Y. 1969) 306 F.Supp. 1002, certiori denied 398 U.S. 905 [26 L.Ed.2d 64, 90 S.Ct. 1696], the court discussed a New York statute requiring all employees of security firms to submit to fingerprinting. The court held that the public's interest in preventing forced fingerprinting did not rise to a fundamental level: "Plaintiffs' contention that fingerprinting is an affront to their dignity and an invasion of their privacy is without substance. The day is long past when fingerprinting carried with it a stigma or any implication of criminality." (*Id.*, 306 F.Supp. 1002, 1007.)

In *Goodman* v. *Liebovitz* (1978) 96 Misc.2d 1059 [410 N.Y.S.2d 502], the court addressed the constitutionality of a statute which required all potential grand jurors to submit to fingerprinting. The court cited *Thom, supra,* with approval, and mentioned that "the realities of a modern urban society of mobile citizens have made certain governmental procedures both justifiable and acceptable to the general population." (*Goodman, supra,* at p. 506.)

It is unnecessary to detail the facts of numerous other cases holding that the invasion of privacy caused by fingerprinting does not necessitate strict scrutiny. Cases which reach that same conclusion have concerned compulsory fingerprinting and photography of state mental patients (*Winters* v. *Miller* (2d Cir. 1971) 446 F.2d 65, 71-72), retention of a suspect's fingerprints after charges have been dropped (*State* v. *Adler* (1976) 16 Wash.App. 459 [558 P.2d 817, 819-820]; *Purdy* v. *Mulkey* (Fla. App. 1969) [228 So.2d 132, 137]; *Walker* v. *Lamb* (Del. 1969) [254 A.2d 265, 267]), compelled fingerprinting, or furnishment of voice or handwriting exemplars ordered by a grand jury (*United States* v. *Doe* (2d Cir. 1972) 457 F.2d 895, 898; *In re Riccardi* (D.N.J. 1972) 337 F.Supp. 253; *United States* v. *Dionisio, supra,* 410 U.S. 1, 14 [35 L.Ed.2d 67, 79]; *United States* v. *Mara, supra,* 410 U.S. 19, 21-22 [35 L.Ed.2d 99, 102-103]), a police officer's taking of fingerprints without full probable cause (*United States* v. *Sechrist* (7th Cir. 1981) 640 F.2d 81, 86; *United States* v. *Sanders* (5th Cir. 1973) 477 F.2d 112, 113), and required fingerprinting in connection with an application for a business license (*Brown* v. *Brannon* (M.D.N.C. 1975) 399 F.Supp. 133, 138; *People* v. *Stuller* (1970) 10 Cal.App.3d 582, 595-596 [89 Cal.Rptr. 158, 41 A.L.R.3d 712]). Furthermore, at least in California: "[T]here are many non-criminal situations in which fingerprints are required of a registrant or applicant for a license. (See Bus. & Prof. Code, §§ 6876 [6894.3], . . . 6894.13 (collection agencies and their employees); and § 7525 (private detectives); Civ. Code, § 607f (humane officers); Gov. Code, § 1030 (peace officers); Ins. Code, § 1652 (insurance agents, brokers, and solicitors); Pen. Cod, § 12052 (applicants for a license to carry a concealed weapon).)" (*People* v. *Stuller, supra,* 10 Cal.App.3d 582, 595.) Even when one is required to submit hair samples and facial skin scrapings, strict scrutiny is not required. (*In re Grand Jury Proceedings* (3d Cir. 1982) 686 F.2d 135, 139.)

The abundance of authority related above can only lead to the conclusion that courts are unwilling to extend strict scrutiny to a regulation requiring fingerprinting. Such a slight intrusion is not seen by courts to infringe on interests which must be deemed fundamental.

### The Rights to Engage in an Occupation and to Contract

Appellants also assert that the San Francisco ordinance creates a restriction on their rights to contract, and to conduct their business as they please. They in addition claim that these rights are of a fundamental stature, and that strict scrutiny is therefore required. However, appellants have cited no authority even remotely supporting their position. Instead, courts have consistently held that restrictions of business practices are susceptible to less severe standards of review. For instance, in *Hirsch* v. *City & County of San Francisco* (1956) 143 Cal.App.2d 313 [300 P.2d 177], at issue was a requirement that persons conducting sales by audible solicitation obtain a license. In upholding the requirement, the court stated that this type of ordinance was to be presumed constitutional and not struck down unless "no rational ground existed as a reason for its enactment." (*Id.,* at p. 320.)

Federal cases also support the reasoning exemplified by *Hirsch, supra.* In *United States* v. *Karnes, supra,* 437 F.2d 284, the court stated: "Adequate protection of the right to engage in particular employment would seem to be furnished by the traditional test for Due Process—whether there is a rational factual basis for legislation." (*Id.,* at p. 288.)

There is no authority suggesting that the rights to engage in an occupation and to contract, by themselves, are fundamental. In any case, the regulations do not cause substantial hardship to San Francisco pawnbrokers' business. As discussed above, it takes little time and effort for the pawnbroker to secure the customer's fingerprint. The Los Angeles ordinance, which requires similar precautions, has not created a great hardship on Los Angeles pawnbrokers' business, and there is no reason why the effect of these regulations should be greater. Therefore, the test of reasonableness should be used when assessing the regulations' constitutionality with respect to the right of privacy, the right to engage in an occupation, and the right to contract.

### Governmental Interests

The final question to be considered is whether the regulations, when analyzed by balancing government interests against the burdens it has created, is reasonable.

A review of cases concerned with fingerprinting would be helpful in this regard. *Thom, supra,* 306 F.Supp. 1002, concerned a New York statute requiring employees of security firms to be fingerprinted. The regulation was made in order to prevent the theft of securities by persons employed in the " 'back office' " areas of security firms. (*Id.,* at p. 1005.) Many of those thefts were committed by " 'employees with previously undisclosed criminal records.' " (*Id.,* at p. 1006.) By taking fingerprints, the Legislature hoped to allow employers to more adequately determine whether a prospective employee was qualified for employment. (*Id.*) In deciding that the statute was a reasonable exercise of legislative power, the court recognized that the securities industry was "affected with a public interest," and that the prevention of thefts was certainly of utmost public concern. (*Id.*) Continuing, the court stated: "Fingerprints have long been recognized as a scientific and accurate means of identification. The statute provides a simple method for security industry employers confronted with the problem of shifting personnel and mounting crime to verify at slight inconvenience to employees and applicants for employment the information submitted by them." (*Id.*) Thus, the court in *Thom* recognized the value which fingerprints may serve in identifying those with criminal records.

The fingerprinting regulation in *Goodman, supra,* 410 N.Y.S.2d 502, was based upon an interest similar to that in *Thom.* Goodman concerned a requirement that all potential grand jurors be fingerprinted. The New York Legislature, concerned with protecting the integrity of the grand jury process, meant to prevent unsuitable persons from sitting on the grand jury. Just as in *Thom,* therefore, the court in *Goodman* recognized the use to which fingerprinting may be put, both as a means of identification and of encouraging honesty.

Another recent case is *People* v. *Stuller, supra,* 10 Cal.App.3d 582. That case concerned a regulation requiring that all temporary and itinerant employees in Palm Springs be fingerprinted. Again, the purpose of the statute was to control crime. The court validated the regulation, noting the many other contexts in which fingerprinting is required and the legitimate government interest in controlling crime. (*Id.,* at p. 595.)

Two older cases, *City of Wichita* v. *Wolkow* (1921) 110 Kan. 127 [202 P. 632], and *Medias* v. *City of Indianapolis* (Ind. 1939) 216 Ind. 155 [23 N.E.2d 590, 125 A.L.R. 590], overruled on other grounds in *City of Indianapolis* v. *Sablica* (1976) 264 Ind. 271 [342 N.E.2d 853, 855], also deserve mention. Both concern statutes nearly identical to the instant one; both required pawnbrokers to take fingerprints of all their customers. Both cases recognized an important social interest in preventing crime, the frequency with which stolen items are found in pawnshops, and the use of fingerprints as a means of identification and an aid in apprehending criminals. (*City of Wichita, supra,* at p. 633; *Medias, supra,* at pp. 594-595.) Both statutes were validated.

The abundance of authority related above consistently recognizes the use of fingerprinting as an effective means of combating crime. Additionally, judicial notice has previously been taken that pawnshops are frequently the repository of stolen goods. (*Sobo* v. *Board of Police Commissioners* (1956) 145 Cal. App.2d 783, 789 [303 P.2d 104].) The record in the present case supports these holdings.

■ Also without merit is appellant's claim that the requirement concerning the posting of interest rates is unconstitutional. Section 21200.5 of the Financial Code provides that a pawnbroker must post a schedule containing charges made on loans. Meanwhile, Financial Code section 21200.7 provides that the pawnbroker must also post his "maximum charge of compensation." The San Francisco regulation, therefore, is in essence only a repetition of the Financial Code requirements, and cannot be seriously contended to be an impermissible restriction on the pawnbrokers' right to do business.

■ Therefore, because of the minimal intrusion which the regulations make into appellants' rights to contract or to engage in an occupation, and their customers' right to privacy, the regulations should be held constitutional.

### III

■ Appellants contend that the San Francisco ordinance creates a classification based on wealth and is therefore violative of equal protection. This contention is based on the fact that a substantial part of pawnshops' customers are poor, and that the law therefore gives an advantage to more affluent citizens who need not rely on pawnshops for their money. Appellants further contend that since classifications based on wealth are "suspect classifications," the ordinance should be subjected to strict scrutiny.

An instructive case for determining whether the instant regulations create a classification based on wealth is *Thayer* v. *Madigan* (1975) 52 Cal.App.3d 16 [125 Cal.Rptr. 28]. There, at issue was a California statute which exempted "from garnishment earnings of a debtor for personal services rendered within 30 days of levy . . . except garnishment for debts incurred 'for the common necessaries of life.'" (*Id.*, at p. 18.) Thus, a person who forfeited on a debt for necessities could have his earnings garnished, while one who had not incurred debts for necessities would not have his earnings garnished.

The court held the contested statute not to have created a classification based on wealth. The court did acknowledge that affluent members of society probably had "little concern with the exemption of earnings for personal services in the limited conditions of the statute." (*Id.*, at p. 19.) However, the court recognized that the distinction in the statute was not between the rich and the poor, but instead: "[B]etween that indeterminate, and doubtless varying, class

of persons who use their earnings to pay for necessaries of life, reserving what credit standing they have for purchase of nonessentials, and those who reverse this practice. The allegedly disadvantaged 'class' is not composed of those whose earnings are below any determinable fiscal level, but only that possibly large, and certainly 'diverse and amorphous class' of persons of middle and lower incomes who from time to time purchase necessaries of life upon credit." (*Id.,* at p. 19.)

Similar reasoning may apply in this case. The San Francisco statute does not distinguish between the rich and the poor, but instead between persons who use pawnshops and persons who do not. There is no requirement that a pawnshop customer must be below a certain income level. Poor persons are not the only ones who frequent pawnshops. The class of persons who do business with pawnshops is certainly "diverse and amorphous," just as was the allegedly disadvantaged class in *Thayer, supra.* Accordingly, strict scrutiny is not required.

Since strict scrutiny of the San Francisco ordinance is not required there is no need to discuss its validity under the rational relation test. As discussed above, the effect of the statute is certainly reasonably related to legitimate state interests and investigating crimes and apprehending criminals.

## IV

Appellants contend that since the San Francisco ordinance provides that pawnshop operators may be subject to administrative sanctions for their employees' violations of the regulations, operators are therefore subject to invalid vicarious criminal liability. However, Penal Code section 15 defines a crime to be an act punished by death, imprisonment, fine, removal from office, or disqualification to hold any office. Revocation or suspension of a license does not fall under any of the above categories, and therefore is not a criminal penalty. Furthermore, vicarious administrative sanctions have previously been approved in California. In *Presto* v. *Alcoholic Bev. etc. Appeals Bd.* (1960) 179 Cal.App.2d 262, 265 [3 Cal.Rptr. 742], the court held that "a licensee may be disciplined by the licensing authority for the unlawful acts of the employees while engaged in the conduct and operation of the business even though the employer did not authorize them and did not have actual knowledge of the activities." California law thus recognizes the use of enforcement provisions such as that in the instant case, and appellants accordingly cannot contend it is invalid.

## V

Appellants also contend that the San Francisco Police Code does not authorize the administrative sanctions called for by paragraph IV, section 1 of the regulations. This contention, however, is without merit.

Article 28 of the Police Code sets forth general regulations concerning pawnbrokers. Section 2815 of that article provides that supplemental rules which are not in conflict with the article may also be adopted. Meanwhile, section 2822 provides that any person violating provisions within article 28 shall be guilty of a misdemeanor. Appellants illogically assume that since the Police Code mentions only criminal penalties, no *lesser* punishment may be adopted, such as that in paragraph IV of the contested regulations. Appellants seemingly wish to ignore section 2815, mentioned above, which allows supplemental regulations. Paragraph IV is no more than one such supplemental regulation. In any case, California law undeniably provides licensing authorities with the power to impose administrative sanctions. (*Presto, supra,* 179 Cal.App.2d 262, 265.)

The judgment is affirmed.

Rattigan, J., and Poché, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 27, 1983. Bird, C. J., was of the opinion that the petition should be granted.